# UNITED STATES *v.* SIOUX NATION OF INDIANS
## ET AL.

No. 79–639.  Argued March 24, 1980—Decided June 30, 1980

BLACKMUN, J., delivered the opinion of the Court, in which BURGER, C. J., and BRENNAN, STEWART, MARSHALL, POWELL, and STEVENS, JJ., joined, and in Parts III and V of which WHITE, J., joined. WHITE, J., filed an opinion concurring in part and concurring in the judgment, *post*, p. 424. REHNQUIST, J., filed a dissenting opinion, *post,* p. 424.

*Deputy Solicitor General Claiborne* argued the cause for the United States. With him on the briefs were *Solicitor General McCree, Assistant Attorney General Moorman, William Alsup, Dirk D. Snel,* and *Martin W. Matzen.*

*Arthur Lazarus, Jr.,* argued the cause for respondents. With him on the brief were *Marvin J. Sonosky, Reid P. Chambers, Harry R. Sachse,* and *William Howard Payne.**

---

*\*Steven M. Tullberg* and *Robert T. Coulter* filed a brief for the Indian Law Resource Center as *amicus curiae.*

MR. JUSTICE BLACKMUN delivered the opinion of the Court.

This case concerns the Black Hills of South Dakota, the Great Sioux Reservation, and a colorful, and in many respects tragic, chapter in the history of the Nation's West. Although the litigation comes down to a claim of interest since 1877 on an award of over $17 million, it is necessary, in order to understand the controversy, to review at some length the chronology of the case and its factual setting.

## I

For over a century now the Sioux Nation has claimed that the United States unlawfully abrogated the Fort Laramie Treaty of April 29, 1868, 15 Stat. 635, in Art. II of which the United States pledged that the Great Sioux Reservation, including the Black Hills, would be "set apart for the absolute and undisturbed use and occupation of the Indians herein named." *Id.*, at 636. The Fort Laramie Treaty was concluded at the culmination of the Powder River War of 1866–1867, a series of military engagements in which the Sioux tribes, led by their great chief, Red Cloud, fought to protect the integrity of earlier-recognized treaty lands from the incursion of white settlers.[1]

The Fort Laramie Treaty included several agreements central to the issues presented in this case. First, it established the Great Sioux Reservation, a tract of land bounded on the east by the Missouri River, on the south by the northern border of the State of Nebraska, on the north by the forty-sixth parallel of north latitude, and on the west by the one

---

[1] The Sioux territory recognized under the Treaty of September 17, 1851, see 11 Stat. 749, included all of the present State of South Dakota, and parts of what is now Nebraska. Wyoming, North Dakota, and Montana The Powder River War is described in some detail in D. Robinson, A History of the Dakota or Sioux Indians 356–381 (1904), reprinted in 2 South Dakota Historical Collections (1904). Red Cloud's career as a warrior and statesman of the Sioux is recounted in 2 G. Hebard & E. Brininstool, The Bozeman Trail 175–204 (1922).

hundred and fourth meridian of west longitude,[2] in addition to certain reservations already existing east of the Missouri. The United States "solemnly agree[d]" that no unauthorized persons "shall ever be permitted to pass over, settle upon, or reside in [this] territory." *Ibid.*

Second, the United States permitted members of the Sioux tribes to select lands within the reservation for cultivation. *Id.*, at 637. In order to assist the Sioux in becoming civilized farmers, the Government promised to provide them with the necessary services and materials, and with subsistence rations for four years. *Id.*, at 639.[3]

Third, in exchange for the benefits conferred by the treaty, the Sioux agreed to relinquish their rights under the Treaty of September 17, 1851, to occupy territories outside the reservation, while reserving their "right to hunt on any lands north of North Platte, and on the Republican Fork of the Smoky Hill river, so long as the buffalo may range thereon in such numbers as to justify the chase." *Ibid.* The Indians also expressly agreed to withdraw all opposition to the build-

---

[2] The boundaries of the reservation included approximately half the area of what is now the State of South Dakota, including all of that State west of the Missouri River save for a narrow strip in the far western portion. The reservation also included a narrow strip of land west of the Missouri and north of the border between North and South Dakota.

[3] The treaty called for the construction of schools and the provision of teachers for the education of Indian children, the provision of seeds and agricultural instruments to be used in the first four years of planting, and the provision of blacksmiths, carpenters, millers, and engineers to perform work on the reservation. See 15 Stat. 637–638, 640. In addition, the United States agreed to deliver certain articles of clothing to each Indian residing on the reservation, "on or before the first day of August of each year, for thirty years." *Id.*, at 638. An annual stipend of $10 per person was to be appropriated for all those members of the Sioux Nation who continued to engage in hunting; those who settled on the reservation to engage in farming would receive $20. *Ibid.* Subsistence rations of meat and flour (one pound of each per day) were to be provided for a period of four years to those Indians upon the reservation who could not provide for their own needs. *Id.*, at 639.

ing of railroads that did not pass over their reservation lands, not to engage in attacks on settlers, and to withdraw their opposition to the military posts and roads that had been established south of the North Platte River. *Ibid.*

Fourth, Art. XII of the treaty provided:

"No treaty for the cession of any portion or part of the reservation herein described which may be held in common shall be of any validity or force as against the said Indians, unless executed and signed by at least three fourths of all the adult male Indians, occupying or interested in the same." *Ibid.*[4]

·The years following the treaty brought relative peace to the Dakotas, an era of tranquility that was disturbed, however, by renewed speculation that the Black Hills, which were included in the Great Sioux Reservation, contained vast quantities of gold and silver.[5] In 1874 the Army planned and undertook an exploratory expedition into the Hills, both for the purpose of establishing a military outpost from which to control those Sioux who had not accepted the terms of the Fort Laramie Treaty, and for the purpose of investigating "the country about which dreamy stories have been told." D. Jackson, Custer's Gold 14 (1966) (quoting the 1874 annual report of Lieutenant General Philip H. Sheridan, as Commander of the Military Division of the Missouri, to the Secretary of War). Lieutenant Colonel George Armstrong Custer led the expedition of close to 1,000 soldiers and teamsters, and a substantial number of military and civilian aides.

---

[4] The Fort Laramie Treaty was considered by some commentators to have been a complete victory for Red Cloud and the Sioux. In 1904 it was described as "the only instance in the history of the United States where the government has gone to war and afterwards negotiated a peace conceding everything demanded by the enemy and exacting nothing in return." Robinson, *supra* n. 1, at 387.

[5] The history of speculation concerning the presence of gold in the Black Hills, which dated from early explorations by prospectors in the 1830's, is capsulized in D. Jackson, Custer's Gold 3–7 (1966).

Custer's journey began at Fort Abraham Lincoln on the Missouri River on July 2, 1874. By the end of that month they had reached the Black Hills, and by mid-August had confirmed the presence of gold fields in that region. The discovery of gold was widely reported in newspapers across the country.[6] Custer's florid descriptions of the mineral and timber resources of the Black Hills, and the land's suitability for grazing and cultivation, also received wide circulation, and had the effect of creating an intense popular demand for the "opening" of the Hills for settlement.[7] The only obstacle to "progress" was the Fort Laramie Treaty that reserved occupancy of the Hills to the Sioux.

Having promised the Sioux that the Black Hills were reserved to them, the United States Army was placed in the position of having to threaten military force, and occasionally to use it, to prevent prospectors and settlers from trespassing on lands reserved to the Indians. For example, in September 1874, General Sheridan sent instructions to Brigadier General Alfred H. Terry, Commander of the Department of Dakota, at Saint Paul, directing him to use force to prevent companies of prospectors from trespassing on the Sioux Reservation. At the same time, Sheridan let it be known that

---

[6] In 1974, the Center for Western Studies completed a project compiling contemporary newspaper accounts of Custer's expedition. See H. Krause & G. Olson, Prelude to Glory (1974). Several correspondents traveled with Custer on the expedition and their dispatches were published by newspapers both in the Midwest and the East. *Id.*, at 6.

[7] See Robinson, *supra* n. 1, at 408–410; A. Tallent, The Black Hills 130 (1975 reprint of 1899 ed.); J. Vaughn, The Reynolds Campaign on Powder River 3–4 (1961).

The Sioux regarded Custer's expedition in itself to be a violation of the Fort Laramie Treaty. In later negotiations for cession of the Black Hills, Custer's trail through the Hills was referred to by a chief known as Fast Bear as "that thieves' road." Jackson, *supra* n. 5, at 24. Chroniclers of the expedition, at least to an extent, have agreed. See *id.*, at 120; G. Manypenny, Our Indian Wards xxix, 296–297 (1972 reprint of 1880 ed.).

he would "give a cordial support to the settlement of the Black Hills," should Congress decide to "open up the country for settlement, by extinguishing the treaty rights of the Indians." App. 62–63. Sheridan's instructions were published in local newspapers. See *id.,* at 63.[8]

Eventually, however, the Executive Branch of the Government decided to abandon the Nation's treaty obligation to preserve the integrity of the Sioux territory. In a letter dated November 9, 1875, to Terry, Sheridan reported that he had met with President Grant, the Secretary of the Interior, and the Secretary of War, and that the President had decided that the military should make no further resistance to the occupation of the Black Hills by miners, "it being his belief that such resistance only increased their desire and complicated the troubles." *Id.,* at 59. These orders were to be enforced "quietly," *ibid.,* and the President's decision was to remain "confidential." *Id.,* at 59–60 (letter from Sheridan to Sherman).

With the Army's withdrawal from its role as enforcer of the Fort Laramie Treaty, the influx of settlers into the Black Hills increased. The Government concluded that the only practical course was to secure to the citizens of the United States the right to mine the Black Hills for gold. Toward

---

[8] General William Tecumseh Sherman, Commanding General of the Army, as quoted in the Saint Louis Globe in 1875, described the military's task in keeping prospectors out of the Black Hills as "the same old story, the story of Adam and Eve and the forbidden fruit." Jackson, *supra* n. 5, at 112. In an interview with a correspondent from the Bismarck Tribune, published September 2, 1874, Custer recognized the military's obligation to keep all trespassers off the reservation lands, but stated that he would recommend to Congress "the extinguishment of the Indian title at the earliest moment practicable for military reasons." Krause & Olson, *supra* n. 6, at 233. Given the ambivalence of feeling among the commanding officers of the Army about the practicality and desirability of its treaty obligations, it is perhaps not surprising that one chronicler of Sioux history would describe the Government's efforts to dislodge invading settlers from the Black Hills as "feeble." F. Hans, The Great Sioux Nation 522 (1964 reprint).

that end, the Secretary of the Interior, in the spring of 1875, appointed a commission to negotiate with the Sioux. The commission was headed by William B. Allison. The tribal leaders of the Sioux were aware of the mineral value of the Black Hills and refused to sell the land for a price less than $70 million. The commission offered the Indians an annual rental of $400,000, or payment of $6 million for absolute relinquishment of the Black Hills. The negotiations broke down.[9]

In the winter of 1875–1876, many of the Sioux were hunting in the unceded territory north of the North Platte River, reserved to them for that purpose in the Fort Laramie Treaty. On December 6, 1875, for reasons that are not entirely clear, the Commissioner of Indian Affairs sent instructions to the Indian agents on the reservation to notify those hunters that if they did not return to the reservation agencies by January 31, 1876, they would be treated as "hostiles." Given the severity of the winter, compliance with these instructions was impossible. On February 1, the Secretary of the Interior nonetheless relinquished jurisdiction over all hostile Sioux, including those Indians exercising their treaty-protected hunting rights, to the War Department. The Army's campaign against the "hostiles" led to Sitting Bull's notable victory over Custer's forces at the battle of the Little Big Horn on June 25. That victory, of course, was short-lived, and those Indians who surrendered to the Army were returned to the reservation, and deprived of their weapons and horses, leaving them completely dependent for survival on rations provided them by the Government.[10]

---

[9] The Report of the Allison Commission to the Secretary of the Interior is contained in the Annual Report of the Commissioner of Indian Affairs (1875), App. 146, 158–195. The unsuccessful negotiations are described in some detail in Jackson, *supra* n. 5, at 116–118, and in Robinson, *supra* n. 1, at 416–421.

[10] These events are described by Manypenny, *supra* n. 7, at 294–321, and Robinson, *supra* n. 1, at 422–438.

In the meantime, Congress was becoming increasingly dissatisfied with the failure of the Sioux living on the reservation to become self-sufficient.[11] The Sioux' entitlement to subsistence rations under the terms of the Fort Laramie Treaty

[11] In Dakota Twilight (1976), a history of the Standing Rock Sioux, Edward A. Milligan states:

"Nearly seven years had elapsed since the signing of the Fort Laramie Treaty and still the Sioux were no closer to a condition of self-support than when the treaty was signed. In the meantime the government had expended nearly thirteen million dollars for their support. The future treatment of the Sioux became a matter of serious moment, even if viewed from no higher standard than that of economics." *Id.*, at 52.

One historian has described the ration provisions of the Fort Laramie Treaty as part of a broader reservation system designed by Congress to convert nomadic tribesmen into farmers. Hagan, The Reservation Policy: Too Little and Too Late, in Indian-White Relations: A Persistent Paradox 157–169 (J. Smith & R. Kvasnicka, eds., 1976). In words applicable to conditions on the Sioux Reservation during the years in question, Professor Hagan stated:

"The idea had been to supplement the food the Indians obtained by hunting until they could subsist completely by farming. Clauses in the treaties permitted hunting outside the strict boundaries of the reservations, but the inevitable clashes between off-reservation hunting parties and whites led this privilege to be first restricted and then eliminated. The Indians became dependent upon government rations more quickly than had been anticipated, while their conversion to agriculture lagged behind schedule.

"The quantity of food supplied by the government was never sufficient for a full ration, and the quality was frequently poor. But in view of the fact that most treaties carried no provision for rations at all, and for others they were limited to four years, the members of Congress tended to look upon rations as a gratuity that should be terminated as quickly as possible. The Indian Service and military personnel generally agreed that it was better to feed than to fight, but to the typical late nineteenth-century member of Congress, not yet exposed to doctrines of social welfare, there was something obscene about grown men and women drawing free rations. Appropriations for subsistence consequently fell below the levels requested by the secretary of the interior.

"That starvation and near-starvation conditions were present on some of the sixty-odd reservations every year for the quarter century after the Civil War is manifest." *Id.*, at 161 (footnotes omitted).

had expired in 1872. Nonetheless, in each of the two following years, over $1 million was appropriated for feeding the Sioux. In August 1876, Congress enacted an appropriations bill providing that "hereafter there shall be no appropriation made for the subsistence" of the Sioux, unless they first relinquished their rights to the hunting grounds outside the reservation, ceded the Black Hills to the United States, and reached some accommodation with the Government that would be calculated to enable them to become self-supporting. Act of Aug. 15, 1876, 19 Stat. 176, 192.[12] Toward this end, Congress requested the President to appoint another commission to negotiate with the Sioux for the cession of the Black Hills.

This commission, headed by George Manypenny, arrived in the Sioux country in early September and commenced meetings with the head men of the various tribes. The members of the commission impressed upon the Indians that the United States no longer had any obligation to provide them with subsistence rations. The commissioners brought with them the text of a treaty that had been prepared in advance. The principal provisions of this treaty were that the Sioux would relinquish their rights to the Black Hills and other lands west of the one hundred and third meridian, and their rights to hunt in the unceded territories to the north, in exchange for subsistence rations for as long as they would be needed to ensure the Sioux' survival. In setting out to obtain the tribes' agreement to this treaty, the commission ignored the stipulation of the Fort Laramie Treaty that any cession of the lands contained within the Great Sioux Reservation would have to be joined in by three-fourths of the adult males. Instead, the treaty was presented just to Sioux

---

[12] The chronology of the enactment of this bill does not necessarily support the view that it was passed in reaction to Custer's defeat at the Battle of the Little Big Horn on June 25, 1876, although some historians have taken a contrary view. See Jackson, *supra* n. 5, at 119.

chiefs and their leading men. It was signed by only 10% of the adult male Sioux population.[13]

Congress resolved the impasse by enacting the 1876 "agreement" into law as the Act of Feb. 28, 1877 (1877 Act). 19 Stat. 254. The Act had the effect of abrogating the earlier Fort Laramie Treaty, and of implementing the terms

---

[13] The commission's negotiations with the chiefs and head men is described by Robinson, *supra* n. 1, at 439–442. He states:

"As will be readily understood, the making of a treaty was a forced put, so far as the Indians were concerned. Defeated, disarmed, dismounted, they were at the mercy of a superior power and there was no alternative but to accept the conditions imposed upon them. This they did with as good grace as possible under all of the conditions existing." *Id.*, at 442.

Another early chronicler of the Black Hills region wrote of the treaty's provisions in the following chauvinistic terms:

"It will be seen by studying the provisions of this treaty, that by its terms the Indians from a material standpoint lost much, and gained but little. By the first article they lose all rights to the unceded Indian territory in Wyoming from which white settlers had then before been altogether excluded; by the second they relinquish all right to the Black Hills, and the fertile valley of the Belle Fourche in Dakota, without additional material compensation; by the third conceding the right of way over the unceded portions of their reservation; by the fourth they receive such supplies only, as were provided by the treaty of 1868, restricted as to the points for receiving them. The only real gain to the Indians seems to be embodied in the fifth article of the treaty [Government's obligation to provide subsistence rations]. The Indians, doubtless, realized that the Black Hills was destined soon to slip out of their grasp, regardless of their claims, and therefore thought it best to yield to the inevitable, and accept whatever was offered them.

"They were assured of a continuance of their regular daily rations, and certain annuities in clothing each year, guaranteed by the treaty of 1868, and what more could they ask or desire, than that a living be provided for themselves, their wives, their children, and all their relations, including squaw men, indirectly, thus leaving them free to live their wild, careless, unrestrained life, exempt from all the burdens and responsibilities of civilized existence? In view of the fact that there are thousands who are obliged to earn their bread and butter by the sweat of their brows, and that have hard work to keep the wolf from the door, they should be satisfied." Tallent, *supra* n. 7, at 133–134.

of the Manypenny Commission's "agreement" with the Sioux leaders.[14]

The passage of the 1877 Act legitimized the settlers' invasion of the Black Hills, but throughout the years it has been regarded by the Sioux as a breach of this Nation's solemn obligation to reserve the Hills in perpetuity for occupation by the Indians. One historian of the Sioux Nation commented on Indian reaction to the Act in the following words:

> "The Sioux thus affected have not gotten over talking about that treaty yet, and during the last few years they have maintained an organization called the Black Hills Treaty Association, which holds meetings each year at the various agencies for the purpose of studying the

---

[14] The 1877 Act "ratified and confirmed" the agreement reached by the Manypenny Commission with the Sioux tribes. 19 Stat. 254. It altered the boundaries of the Great Sioux Reservation by adding some 900,000 acres of land to the north, while carving out virtually all that portion of the reservation between the one hundred and third and one hundred and fourth meridians, including the Black Hills, an area of well over 7 million acres. The Indians also relinquished their rights to hunt in the unceded lands recognized by the Fort Laramie Treaty, and agreed that three wagon roads could be cut through their reservation. *Id.*, at 255.

In exchange, the Government reaffirmed its obligation to provide all annuities called for by the Fort Laramie Treaty, and "to provide all necessary aid to assist the said Indians in the work of civilization; to furnish to them schools and instruction in mechanical and agricultural arts, as provided for by the treaty of 1868." *Id.*, at 256. In addition, every individual was to receive fixed quantities of beef or bacon and flour, and other foodstuffs, in the discretion of the Commissioner of Indian Affairs, which "shall be continued until the Indians are able to support themselves." *Ibid.* The provision of rations was to be conditioned, however, on the attendance at school by Indian children, and on the labor of those who resided on lands suitable for farming. The Government also promised to assist the Sioux in finding markets for their crops and in obtaining employment in the performance of Government work on the reservation. *Ibid.*

Later congressional actions having the effect of further reducing the domain of the Great Sioux Reservation are described in *Rosebud Sioux Tribe* v. *Kneip,* 430 U. S. 584, 589 (1977).

treaty with the intention of presenting a claim against
the government for additional reimbursements for the
territory ceded under it. Some think that Uncle Sam
owes them about $9,000,000 on the deal, but it will prob-
ably be a hard matter to prove it." F. Fiske, The Tam-
ing of the Sioux 132 (1917).

Fiske's words were to prove prophetic.

## II

Prior to 1946, Congress had not enacted any mechanism of
general applicability by which Indian tribes could litigate
treaty claims against the United States.[15] The Sioux, how-
ever, after years of lobbying, succeeded in obtaining from
Congress the passage of a special jurisdictional Act which
provided them a forum for adjudication of all claims against
the United States "under any treaties, agreements, or laws of
Congress, or for the misappropriation of any of the funds or
lands of said tribe or band or bands thereof." Act of June 3,
1920, ch. 222, 41 Stat. 738. Pursuant to this statute, the
Sioux, in 1923, filed a petition with the Court of Claims
alleging that the Government had taken the Black Hills with-
out just compensation, in violation of the Fifth Amendment.
This claim was dismissed by that court in 1942. In a lengthy
and unanimous opinion, the court concluded that it was not
authorized by the Act of June 3, 1920, to question whether the
compensation afforded the Sioux by Congress in 1877 was an
adequate price for the Black Hills, and that the Sioux' claim
in this regard was a moral claim not protected by the Just
Compensation Clause. *Sioux Tribe* v. *United States,* 97 Ct.
Cl. 613 (1942), cert. denied, 318 U. S. 789 (1943).

In 1946, Congress passed the Indian Claims Commission
Act, 60 Stat. 1049, 25 U. S. C. § 70 *et seq.,* creating a new
forum to hear and determine all tribal grievances that had

---

[15] See § 9 of the Act of Mar. 3, 1863, 12 Stat. 767; § 1 of the Tucker
Act of Mar. 3, 1887, 24 Stat. 505.

arisen previously. In 1950, counsel for the Sioux resubmitted the Black Hills claim to the Indian Claims Commission. The Commission initially ruled that the Sioux had failed to prove their case. *Sioux Tribe* v. *United States,* 2 Ind. Cl. Comm'n 646 (1954), aff'd, 146 F. Supp. 229 (Ct. Cl. 1956). The Sioux filed a motion with the Court of Claims to vacate its judgment of affirmance, alleging that the Commission's decision had been based on a record that was inadequate, due to the failings of the Sioux' former counsel. This motion was granted and the Court of Claims directed the Commission to consider whether the case should be reopened for the presentation of additional evidence. On November 19, 1958, the Commission entered an order reopening the case and announcing that it would reconsider its prior judgment on the merits of the Sioux claim. App. 265–266; see *Sioux Tribe* v. *United States,* 182 Ct. Cl. 912 (1968) (summary of proceedings).

Following the Sioux' filing of an amended petition, claiming again that the 1877 Act constituted a taking of the Black Hills for which just compensation had not been paid, there ensued a lengthy period of procedural sparring between the Indians and the Government. Finally, in October 1968, the Commission set down three questions for briefing and determination: (1) What land and rights did the United States acquire from the Sioux by the 1877 Act? (2) What, if any, consideration was given for that land and those rights? And (3) if there was no consideration for the Government's acquisition of the land and rights under the 1877 Act, was there any payment for such acquisition? App. 266.

Six years later, by a 4-to-1 vote, the Commission reached a preliminary decision on these questions. *Sioux Nation* v. *United States,* 33 Ind. Cl. Comm'n 151 (1974). The Commission first held that the 1942 Court of Claims decision did not bar the Sioux' Fifth Amendment taking claim through application of the doctrine of res judicata. The Commission concluded that the Court of Claims had dismissed the earlier

suit for lack of jurisdiction, and that it had not determined the merits of the Black Hills claim. The Commission then went on to find that Congress, in 1877, had made no effort to give the Sioux full value for the ceded reservation lands. The only new obligation assumed by the Government in exchange for the Black Hills was its promise to provide the Sioux with subsistence rations, an obligation that was subject to several limiting conditions. See n. 14, *supra*. Under these circumstances, the Commission concluded that the consideration given the Indians in the 1877 Act had no relationship to the value of the property acquired. Moreover, there was no indication in the record that Congress ever attempted to relate the value of the rations to the value of the Black Hills Applying the principles announced by the Court of Claims in *Three Tribes of Fort Berthold Reservation* v. *United States,* 182 Ct. Cl. 543, 390 F. 2d 686 (1968), the Commission concluded that Congress had acted pursuant to its power of eminent domain when it passed the 1877 Act, rather than as a trustee for the Sioux, and that the Government must pay the Indians just compensation for the taking of the Black Hills.[16]

The Government filed an appeal with the Court of Claims

---

[16] The Commission determined that the fair market value of the Black Hills as of February 28, 1877, was $17.1 million. In addition, the United States was held liable for gold removed by trespassing prospectors prior to that date, with a fair market value in the ground of $450,000. The Commission determined that the Government should receive a credit for all amounts it had paid to the Indians over the years in compliance with its obligations under the 1877 Act. These amounts were to be credited against the fair market value of the lands and gold taken, and interest as it accrued. The Commission decided that further proceedings would be necessary to compute the amounts to be credited and the value of the rights-of-way across the reservation that the Government also had acquired through the 1877 Act.

Chairman Kuykendall dissented in part from the Commission's judgment, arguing that the Sioux' taking claim was barred by the res judicata effect of the 1942 Court of Claims decision.

from the Commission's interlocutory order, arguing alternatively that the Sioux' Fifth Amendment claim should have been barred by principles of res judicata and collateral estoppel, or that the 1877 Act did not effect a taking of the Black Hills for which just compensation was due. Without reaching the merits, the Court of Claims held that the Black Hills claim was barred by the res judicata effect of its 1942 decision. *United States* v. *Sioux Nation,* 207 Ct. Cl. 234, 518 F. 2d 1298 (1975). The court's majority recognized that the practical impact of the question presented was limited to a determination of whether or not an award of interest would be available to the Indians. This followed from the Government's failure to appeal the Commission's holding that it had acquired the Black Hills through a course of unfair and dishonorable dealing for which the Sioux were entitled to damages, without interest, under § 2 of the Indian Claims Commission Act, 60 Stat. 1050, 25 U. S. C. § 70a (5). Only if the acquisition of the Black Hills amounted to an unconstitutional taking would the Sioux be entitled to interest. 207 Ct. Cl., at 237, 518 F. 2d, at 1299.[17]

---

[17] See *United States* v. *Tillamooks,* 341 U. S. 48, 49 (1951) (recognizing that the "traditional rule" is that interest is not to be awarded on claims against the United States absent an express statutory provision to the contrary and that the "only exception arises when the taking entitles the claimant to just compensation under the Fifth Amendment"). In *United States* v. *Klamath Indians,* 304 U. S. 119, 123 (1938), the Court stated: "The established rule is that the taking of property by the United States in the exertion of its power of eminent domain implies a promise to pay just compensation, *i. e.,* value at the time of the taking plus an amount sufficient to produce the full equivalent of that value paid contemporaneously with the taking."

The Court of Claims also noted that subsequent to the Indian Claims Commission's judgment, Congress had enacted an amendment to 25 U. S. C. § 70a, providing generally that expenditures made by the Government "for food, rations, or provisions shall not be deemed payments on the claim." Act of Oct. 27, 1974, § 2, 88 Stat. 1499. Thus, the Government would no longer be entitled to an offset from any judgment eventually awarded the Sioux based on its appropriations for subsistence rations

388

The court affirmed the Commission's holding that a want of fair and honorable dealings in this case was evidenced, and held that the Sioux thus would be entitled to an award of at least $17.5 million for the lands surrendered and for the gold taken by trespassing prospectors prior to passage of the 1877 Act. See n. 16, *supra*. The court also remarked upon President Grant's duplicity in breaching the Government's treaty obligation to keep trespassers out of the Black Hills, and the pattern of duress practiced by the Government on the starving Sioux to get them to agree to the sale of the Black Hills. The court concluded: "A more ripe and rank case of dishonorable dealings will never, in all probability, be found in our history, which is not, taken as a whole, the disgrace it now pleases some persons to believe." 207 Ct. Cl., at 241, 518 F. 2d, at 1302.

Nonetheless, the court held that the merits of the Sioux' taking claim had been reached in 1942, and whether resolved "rightly or wrongly," *id.*, at 249, 518 F. 2d, at 1306, the claim was now barred by res judicata. The court observed that interest could not be awarded the Sioux on judgments obtained pursuant to the Indian Claims Commission Act, and that while Congress could correct this situation, the court could not. *Ibid.*[18] The Sioux petitioned this Court for a writ of certiorari, but that petition was denied. 423 U. S. 1016 (1975).

The case returned to the Indian Claims Commission, where the value of the rights-of-way obtained by the Government through the 1877 Act was determined to be $3,484, and where it was decided that the Government had made no payments to the Sioux that could be considered as offsets. App. 316.

in the years following the passage of the 1877 Act. 207 Ct. Cl., at 240, 518 F. 2d, at 1301. See n. 16, *supra*.

[18] Judge Davis dissented with respect to the court's holding on res judicata, arguing that the Sioux had not had the opportunity to present their claim fully in 1942. 207 Ct. Cl., at 249, 518 F. 2d, at 1306.

The Government then moved the Commission to enter a final award in favor of the Sioux in the amount of $17.5 million, see n. 16, *supra,* but the Commission deferred entry of final judgment in view of legislation then pending in Congress that dealt with the case.

On March 13, 1978, Congress passed a statute providing for Court of Claims review of the merits of the Indian Claims Commission's judgment that the 1877 Act effected a taking of the Black Hills, without regard to the defenses of res judicata and collateral estoppel. The statute authorized the Court of Claims to take new evidence in the case, and to conduct its review of the merits *de novo.* Pub. L. 95–243, 92 Stat. 153, amending § 20 (b) of the Indian Claims Commission Act. See 25 U. S. C. § 70s (b) (1976 ed., Supp. II).

Acting pursuant to that statute, a majority of the Court of Claims, sitting en banc, in an opinion by Chief Judge Friedman, affirmed the Commission's holding that the 1877 Act effected a taking of the Black Hills and of rights-of-way across the reservation. 220 Ct. Cl. 442, 601 F. 2d 1157 (1979).[19] In doing so, the court applied the test it had earlier articulated in *Fort Berthold,* 182 Ct. Cl., at 553, 390 F. 2d, at 691, asking whether Congress had made "a good faith effort to give the Indians the full value of the land," 220 Ct. Cl., at 452, 601 F. 2d, at 1162, in order to decide whether the 1877 Act had effected a taking or whether it had been a noncompensable act of congressional guardianship over tribal property. The court characterized the Act as a taking, an exercise of Congress' power of eminent domain over Indian property. It distinguished broad statements seemingly leading to a contrary

---

[19] While affirming the Indian Claims Commission's determination that the acquisition of the Black Hills and the rights-of-way across the reservation constituted takings, the court reversed the Commission's determination that the mining of gold from the Black Hills by prospectors prior to 1877 also constituted a taking. The value of the gold, therefore, could not be considered as part of the principal on which interest would be paid to the Sioux. 220 Ct. Cl., at 466–467, 601 F. 2d, at 1171–1172.

result in *Lone Wolf* v. *Hitchcock,* 187 U. S. 553 (1903), as inapplicable to a case involving a claim for just compensation. 220 Ct. Cl., at 465, 601 F. 2d, at 1170.[20]

The court thus held that the Sioux were entitled to an award of interest, at the annual rate of 5%, on the principal sum of $17.1 million, dating from 1877.[21]

We granted the Government's petition for a writ of certiorari, 444 U. S. 989 (1979), in order to review the important constitutional questions presented by this case, questions not only of longstanding concern to the Sioux, but also of significant economic import to the Government.

## III

Having twice denied petitions for certiorari in this litigation, see 318 U. S. 789 (1943); 423 U. S. 1016 (1975), we are confronted with it for a third time as a result of the amendment, above noted, to the Indian Claims Commission Act of 1946, 25 U. S. C. § 70s (b) (1976 ed., Supp. II), which

---

[20] The *Lone Wolf* decision itself involved an action by tribal leaders to enjoin the enforcement of a statute that had the effect of abrogating the provisions of an earlier-enacted treaty with an Indian tribe. See Part IV–B, *infra.*

[21] Judge Nichols concurred in the result, and all of the court's opinion except that portion distinguishing *Lone Wolf.* He would have held *Lone Wolf's* principles inapplicable to this case because Congress had not created a record showing that it had considered the compensation afforded the Sioux under the 1877 Act to be adequate consideration for the Black Hills. He did not believe that *Lone Wolf* could be distinguished on the ground that it involved an action for injunctive relief rather than a claim for just compensation. 220 Ct. Cl., at 474–475, 601 F. 2d, at 1175–1176.

Judge Bennett, joined by Judge Kunzig, dissented. The dissenters would have read *Lone Wolf* broadly to hold that it was within Congress' constitutional power to dispose of tribal property without regard to good faith or the amount of compensation given. "The law we should apply is that once Congress has, through negotiation or statute, recognized the Indian tribes' rights in the property, has disposed of it, and has given value to the Indians for it, that is the end of the matter." 220 Ct. Cl., at 486, 601 F. 2d, at 1182.

directed the Court of Claims to review the merits of the Black Hills takings claim without regard to the defense of res judicata. The amendment, approved March 13, 1978, provides:

> "Notwithstanding any other provision of law, upon application by the claimants within thirty days from the date of the enactment of this sentence, the Court of Claims shall review on the merits, without regard to the defense of res judicata or collateral estoppel, that portion of the determination of the Indian Claims Commission entered February 15, 1974, adjudging that the Act of February 28, 1877 (19 Stat. 254), effected a taking of the Black Hills portion of the Great Sioux Reservation in violation of the fifth amendment, and shall enter judgment accordingly. In conducting such review, the Court shall receive and consider any additional evidence, including oral testimony, that either party may wish to provide on the issue of a fifth amendment taking and shall determine that issue de novo." 92 Stat. 153.

Before turning to the merits of the Court of Claims' conclusion that the 1877 Act effected a taking of the Black Hills, we must consider the question whether Congress, in enacting this 1978 amendment, "has inadvertently passed the limit which separates the legislative from the judicial power." *United States* v. *Klein*, 13 Wall. 128, 147 (1872).

### A

There are two objections that might be raised to the constitutionality of this amendment, each framed in terms of the doctrine of separation of powers. The first would be that Congress impermissibly has disturbed the finality of a judicial decree by rendering the Court of Claims' earlier judgments in this case mere advisory opinions. See *Hayburn's Case*, 2 Dall. 409, 410–414 (1792) (setting forth the views of three Circuit Courts, including among their complements Mr. Chief

Justice Jay, and Justices Cushing, Wilson, Blair, and Iredell, that the Act of Mar. 23, 1792, 1 Stat. 243, was unconstitutional because it subjected the decisions of the Circuit Courts concerning eligibility for pension benefits to review by the Secretary of War and the Congress). The objection would take the form that Congress, in directing the Court of Claims to reach the merits of the Black Hills claim, effectively reviewed and reversed that court's 1975 judgment that the claim was barred by res judicata, or its 1942 judgment that the claim was not cognizable under the Fifth Amendment. Such legislative review of a judicial decision would interfere with the independent functions of the Judiciary.

The second objection would be that Congress overstepped its bounds by granting the Court of Claims jurisdiction to decide the merits of the Black Hills claim, while prescribing a rule for decision that left the court no adjudicatory function to perform. See *United States* v. *Klein,* 13 Wall., at 146; *Yakus* v. *United States,* 321 U. S. 414, 467–468 (1944) (Rutledge, J., dissenting). Of course, in the context of this amendment, that objection would have to be framed in terms of Congress' removal of a single issue from the Court of Claims' purview, the question whether res judicata or collateral estoppel barred the Sioux' claim. For in passing the amendment, Congress left no doubt that the Court of Claims was free to decide the merits of the takings claim in accordance with the evidence it found and applicable rules of law. See n. 23, *infra.*

These objections to the constitutionality of the amendment were not raised by the Government before the Court of Claims. At oral argument in this Court, counsel for the United States, upon explicit questioning, advanced the position that the amendment was not beyond the limits of legislative power.[22] The question whether the amendment

---

[22] In response to a question from the bench, Government counsel stated: "I think Congress is entitled to say, 'You may have another opportunity to litigate your lawsuit.'" Tr. of Oral Arg. 20.

impermissibly interfered with judicial power was debated, however, in the House of Representatives, and that body concluded that the Government's waiver of a "technical legal defense" in order to permit the Court of Claims to reconsider the merits of the Black Hills claim was within Congress' power to enact.[23]

---

[23] Representative Gudger of North Carolina persistently argued the view that the amendment unconstitutionally interfered with the powers of the Judiciary. He dissented from the Committee Report in support of the amendment's enactment, stating:

"I do not feel that when the Federal Judiciary has adjudicated a matter through appellate review and no error has been found by the Supreme Court of the United States in the application by the lower court (in this instance the Court of Claims) of the doctrine of res judicata or collateral estoppel that the Congress of the United States should enact legislation which has the effect of reversing the decision of the Judiciary." H. R. Rep. No. 95-529, p. 17 (1977).

Representative Gudger stated that he could support a bill to grant a special appropriation to the Sioux Nation, acknowledging that it was for the purpose of extinguishing Congress' moral obligation arising from the Black Hills claim, "but I cannot justify in my own mind this exercise of congressional review of a judicial decision which I consider contravenes our exclusively legislative responsibility under the separation of powers doctrine." *Id.*, at 18.

The Congressman, in the House debates, elaborated upon his views on the constitutionality of the amendment. He stated that the amendment would create "a real and serious departure from the separation-of-powers doctrine, which I think should continue to govern us and has governed us in the past." 124 Cong. Rec. 2953 (1978). He continued:

"I submit that this bill has the precise and exact effect of reversing a decision of the Court of Claims which has heretofore been sustained by the Supreme Court of the United States. Thus, it places the Congress of the United States in the position of reviewing and reversing a judicial decision in direct violation of the separation-of-powers doctrine so basic to our tripartite form of government.

"I call to your attention that, in this instance, we are not asked to change the law, applicable uniformly to all cases of like nature throughout the land, but that this bill proposes to change the application of the law with respect to one case only. In doing this, we are not legislating, we are adjudicating. Moreover, we are performing the adjudicatory func-

The question debated on the floor of the House is one the
answer to which is not immediately apparent.  It requires
us to examine the proper role of Congress and the courts in

tion with respect to a case on which the Supreme Court of the United
States has acted.  Thus, in this instance, we propose to reverse the deci-
sion of the Supreme Court of our land." *Ibid.*

Representative Gudger's views on the effect of the amendment vis-à-vis
the independent powers of the Judiciary were not shared by his colleagues.
Representative Roncalio stated:

"I want to emphasize that the bill does not make a congressional deter-
mination of whether or not the United States violated the fifth amend-
ment.  It does not say that the Sioux are entitled to the interest on the
$17,500,000 award.  It says that the court will review the facts and law
in the case and determine that question." *Id.,* at 2954.

Representative Roncalio also informed the House that Congress in the
past had enacted legislation waiving the defense of res judicata in private
claims cases, and had done so twice with respect to Indian claims. *Ibid.*
He mentioned the Act of Mar. 3, 1881, 21 Stat. 504 (which actually waived
the effect of a prior award made to the Choctaw Nation by the Senate),
and the Act of Feb. 7, 1925, 43 Stat. 812 (authorizing the Court of Claims
and the Supreme Court to consider claims of the Delaware Tribe "de
novo, upon a legal and equitable basis, and without regard to any decision,
finding, or settlement heretofore had in respect of any such claims").
Both those enactments were also brought to the attention of a Senate Sub-
committee in hearings on this amendment conducted during the previous
legislative session.  See Hearing on S. 2780 before the Subcommittee on
Indian Affairs of the Senate Committee on Interior and Insular Affairs,
94th Cong., 2d Sess., 16–17 (1976) (letter from Morris Thompson, Com-
missioner of Indian Affairs).  The enactments referred to by Representa-
tive Roncalio were construed, respectively, in *Choctaw Nation* v. *United
States,* 119 U. S. 1, 29–32 (1886), and *Delaware Tribe* v. *United States,*
74 Ct. Cl. 368 (1932).

Representative Pressler also responded to Representative Gudger's inter-
pretation of the proposed amendment, arguing that "[w]e are, indeed,
here asking for a review and providing the groundwork for a review.  I
do not believe that we would be reviewing a decision; indeed, the same
decision might be reached." 124 Cong. Rec. 2955 (1978).  Earlier, Rep-
resentative Meeds clearly had articulated the prevailing congressional view
on the effect of the proposed amendment.  After summarizing the history
of the Black Hills litigation, he stated:

"I go through that rather complicated history for the purpose of point-

recognizing and determining claims against the United States, in light of more general principles concerning the legislative and judicial roles in our tripartite system of government. Our examination of the amendment's effect, and of this Court's precedents, leads us to conclude that neither of the two separation-of-powers objections described above is presented by this legislation.

B

Our starting point is *Cherokee Nation* v. *United States,* 270 U. S. 476 (1926). That decision concerned the Special Act of Congress, dated March 3, 1919, 40 Stat. 1316, conferring jurisdiction upon the Court of Claims "to hear, consider, and determine the claim of the Cherokee Nation against the United States for interest, in addition to all other interest heretofore allowed and paid, alleged to be owing from the United States to the Cherokee Nation on the funds arising from the judgment of the Court of Claims of May eighteenth, nineteen hundred and five." In the judgment referred to by the Act, the Court of Claims had allowed 5% simple interest on four Cherokee claims, to accrue from the date of liability. *Cherokee Nation* v. *United States,* 40 Ct. Cl. 252 (1905). This Court had affirmed that judgment, including the interest award. *United States* v. *Cherokee Nation,* 202 U. S. 101,

---

ing out to the Members that the purpose of this legislation is not to decide the matter on the merits. That is still for the court to do. The purpose of this legislation is only to waive the defense of res judicata and to waive this technical defense, as we have done in a number of other instances in this body, so this most important claim can get before the courts again and can be decided without a technical defense and on the merits." *Id.,* at 2388.

See also S. Rep. No. 95–112, p. 6 (1977) ("The enactment of [the amendment] is needed to waive certain legal prohibitions so that the Sioux tribal claim may be considered on its merits before an appropriate judicial forum"); H. R. Rep. No. 95–529, p. 6 (1977) ("The enactment of [the amendment] is needed to waive certain technical legal defenses so that the Sioux tribal claim may be considered on its merits before an appropriate judicial forum").

123–126 (1906). Thereafter, and following payment of the judgment, the Cherokee presented to Congress a new claim that they were entitled to compound interest on the lump sum of principal and interest that had accrued up to 1895. It was this claim that prompted Congress, in 1919, to reconfer jurisdiction on the Court of Claims to consider the Cherokee's entitlement to that additional interest.

Ultimately, this Court held that the Cherokee were not entitled to the payment of compound interest on the original judgment awarded by the Court of Claims. 270 U. S., at 487-496. Before turning to the merits of the interest claim, however, the Court considered "the effect of the Act of 1919 in referring the issue in this case to the Court of Claims." *Id.*, at 485–486. The Court's conclusion concerning that question bears close examination:

> "The judgment of this Court in the suit by the Cherokee Nation against the United States, in April, 1906 (202 U. S. 101), already referred to, awarded a large amount of interest. The question of interest was considered and decided, and it is quite clear that but for the special Act of 1919, above quoted, the question here mooted would have been foreclosed as *res judicata*. In passing the Act, Congress must have been well advised of this, and the only possible construction therefore to be put upon it is that Congress has therein expressed its desire, so far as the question of interest is concerned, to waive the effect of the judgment as *res judicata,* and to direct the Court of Claims to re-examine it and determine whether the interest therein allowed was all that should have been allowed, or whether it should be found to be as now claimed by the Cherokee Nation. The Solicitor General, representing the Government, properly concedes this to be the correct view. *The power of Congress to waive such an adjudication of course is clear." Id.,* at 486 (last emphasis supplied).

The holding in *Cherokee Nation* that Congress has the power to waive the res judicata effect of a prior judgment entered in the Government's favor on a claim against the United States is dispositive of the question considered here. Moreover, that holding is consistent with a substantial body of precedent affirming the broad constitutional power of Congress to define and "to pay the Debts . . . of the United States." U. S. Const., Art. I, § 8, cl. 1. That precedent speaks directly to the separation-of-powers objections discussed above.

The scope of Congress' power to pay the Nation's debts seems first to have been construed by this Court in *United States v. Realty Co.*, 163 U. S. 427 (1896). There, the Court stated:

> "The term 'debts' includes those debts or claims which rest upon a merely equitable or honorary obligation, and which would not be recoverable in a court of law if existing against an individual. The nation, speaking broadly, owes a 'debt' to an individual when his claim grows out of general principles of right and justice; when, in other words, it is based upon considerations of a moral or merely honorary nature, such as are binding on the conscience or the honor of an individual, although the debt could obtain no recognition in a court of law. The power of Congress extends at least as far as the recognition and payment of claims against the government which are thus founded." *Id.*, at 440.

Other decisions clearly establish that Congress may recognize its obligation to pay a moral debt not only by direct appropriation, but also by waiving an otherwise valid defense to a legal claim against the United States, as Congress did in this case and in *Cherokee Nation*. Although the Court in *Cherokee Nation* did not expressly tie its conclusion that Congress had the power to waive the res judicata effect of a judgment in favor of the United States to Congress' consti-

tutional power to pay the Nation's debts, the *Cherokee Nation* opinion did rely on the decision in *Nock* v. *United States,* 2 Ct. Cl. 451 (1867). See 270 U. S., at 486.

In *Nock,* the Court of Claims was confronted with the precise question whether Congress invaded judicial power when it enacted a joint resolution, 14 Stat. 608, directing that court to decide a damages claim against the United States "in accordance with the principles of equity and justice," even though the merits of the claim previously had been resolved in the Government's favor. The court rejected the Government's argument that the joint resolution was unconstitutional as an exercise of "judicial powers" because it had the effect of setting aside the court's prior judgment. Rather, the court concluded:

> "It is unquestionable that the Constitution has invested Congress with no judicial powers; it cannot be doubted that a legislative direction to a court to find a judgment in a certain way would be little less than a judgment rendered directly by Congress. But here Congress do not attempt to award judgment, nor to grant a new trial *judicially;* neither have they *reversed* a decree of this court; nor attempted in any way to interfere with the administration of justice. Congress are here to all intents and purposes the defendants, and as such they come into court through this resolution and say that they will not plead the former trial in bar, nor interpose the legal objection which defeated a recovery before." 2 Ct. Cl., at 457–458 (emphases in original).

The *Nock* court thus expressly rejected the applicability of separation-of-powers objections to a congressional decision to waive the res judicata effect of a judgment in the Government's favor.[24]

---

[24] The joint resolution at issue in *Nock* also limited the amount of the judgment that the Court of Claims could award Nock to a sum that had

The principles set forth in *Cherokee Nation* and *Nock* were substantially reaffirmed by this Court in *Pope* v. *United States,* 323 U. S. 1 (1944). There Congress had enacted special legislation conferring jurisdiction upon the Court of

been established in a report of the Solicitor of the Treasury to the Senate. See 14 Stat. 608. The court rejected the Government's argument that the Constitution had not vested in Congress "such discretion to fetter or circumscribe the course of justice." See 2 Ct. Cl., at 455. The court reasoned that this limitation on the amount of the claimant's recovery was a valid exercise of Congress' power to condition waivers of the sovereign immunity of the United States. "[I]t would be enough to say that the defendants cannot be sued except with their own consent; and Congress have the same power to give this consent to a second action as they had to give it to a first." *Id.,* at 458.

Just because we have addressed our attention to the ancient Court of Claims' decision in *Nock,* it should not be inferred that legislative action of the type at issue here is a remnant of the far-distant past. Special jurisdictional Acts waiving affirmative defenses of the United States to legal claims, and directing the Court of Claims to resolve the merits of those claims, are legion. See *Mizokami* v. *United States,* 188 Ct. Cl. 736, 740–741, and nn. 1 and 2, 414 F. 2d 1375, 1377, and nn. 1 and 2 (1969) (collecting cases). A list of cases, in addition to those discussed in the text, that have recognized or acted upon Congress' power to waive the defense of res judicata to claims against the United States follows (the list is not intended to be exhaustive): *United States* v. *Grant,* 110 U. S. 225 (1884); *Lamborn & Co.* v. *United States,* 106 Ct. Cl. 703, 724–728, 65 F. Supp. 569, 576–578 (1946); *Menominee Tribe* v. *United States,* 101 Ct. Cl. 10, 19 (1944); *Richardson* v. *United States,* 81 Ct. Cl. 948, 956–957 (1935); *Delaware Tribe* v. *United States,* 74 Ct. Cl. 368 (1932); *Garrett* v. *United States,* 70 Ct. Cl. 304, 310–312 (1930).

In *Richardson,* the Court of Claims observed:

"The power of Congress by special act to waive any defense, either legal or equitable, which the Government may have to a suit in this court, as it did in the *Nock* and *Cherokee Nation cases,* has never been questioned. The reports of the court are replete with cases where Congress, impressed with the equitable justice of claims which have been rejected by the court on legal grounds, has, by special act, waived defenses of the Government which prevented recovery and conferred jurisdiction on the court to again adjudicate the case. In such instances the court proceeded in conformity with the provisions of the act of reference and in cases, too numerous for

Claims, "notwithstanding any prior determination, any statute of limitations, release, or prior acceptance of partial allowance, to hear, determine, and render judgment upon" certain claims against the United States arising out of a construction contract. Special Act of Feb. 27, 1942, § 1, 56 Stat. 1122. The court was also directed to determine Pope's claims and render judgment upon them according to a particular formula for measuring the value of the work that he had performed. The Court of Claims construed the Special Act as deciding the questions of law presented by the case, and leaving it the role merely of computing the amount of the judgment for the claimant according to a mathematical formula. *Pope* v. *United States,* 100 Ct. Cl. 375, 379–380, 53 F. Supp 570, 571–572 (1944). Based upon that reading of the Act, and this Court's decision in *United States* v. *Klein,* 13 Wall. 128 (1872) (see discussion *infra,* at 402–405), the Court of Claims held that the Act unconstitutionally interfered with judicial independence. 100 Ct. Cl., at 380–382, 53 F. Supp., at 572–573. It distinguished *Cherokee Nation* as a case in which Congress granted a claimant a new trial, without directing the courts how to decide the case. 100 Ct. Cl., at 387, and n. 5, 53 F. Supp., at 575, and n. 5.

This Court reversed the Court of Claims' judgment. In

---

citation here, awarded judgments to claimants whose claims had previously been rejected." 81 Ct. Cl., at 957.

Two similar decisions by the United States Court of Appeals for the Eighth Circuit are of interest. Both involved the constitutionality of a joint resolution that set aside dismissals of actions brought under the World War Veterans' Act, 1924, 38 U. S. C. § 445 (1952 ed.), and authorized the reinstatement of those war-risk insurance disability claims. The Court of Appeals found no constitutional prohibition against a congressional waiver of an adjudication in the Government's favor, or against conferring upon claimants against the United States the right to have their cases heard again on the merits. See *James* v. *United States,* 87 F. 2d 897, 898 (1937); *United States* v. *Hossmann,* 84 F. 2d 808, 810 (1936). The court relied, in part, on the holding in *Cherokee Nation,* and the sovereign immunity rationale applied in *Nock.*

doing so, the Court differed with the Court of Claims' interpretation of the effect of the Special Act. First, the Court held that the Act did not disturb the earlier judgment denying Pope's claim for damages. "While inartistically drawn the Act's purpose and effect seem rather to have been to create a new obligation of the Government to pay petitioner's claims where no obligation existed before." 323 U. S., at 9. Second, the Court held that Congress' recognition of Pope's claim was within its power to pay the Nation's debts, and that its use of the Court of Claims as an instrument for exercising that power did not impermissibly invade the judicial function:

> "We perceive no constitutional obstacle to Congress' imposing on the Government a new obligation where there had been none before, for work performed by petitioner which was beneficial to the Government and for which Congress thought he had not been adequately compensated. The power of Congress to provide for the payment of debts, conferred by § 8 of Article I of the Constitution, is not restricted to payment of those obligations which are legally binding on the Government. It extends to the creation of such obligations in recognition of claims which are merely moral or honorary. . . . *United States* v. *Realty Co.,* 163 U. S. 427. . . . Congress, by the creation of a legal, in recognition of a moral, obligation to pay petitioner's claims plainly did not encroach upon the judicial function which the Court of Claims had previously exercised in adjudicating that the obligation was not legal. [Footnote citing *Nock* and other cases omitted.] Nor do we think it did so by directing that court to pass upon petitioner's claims in conformity to the particular rule of liability prescribed by the Special Act and to give judgment accordingly. . . . See *Cherokee Nation* v. *United States,* 270 U. S. 476, 486." *Id.,* at 9–10.

In explaining its holding that the Special Act did not invade the judicial province of the Court of Claims by directing it to reach its judgment with reference to a specified formula, the Court stressed that Pope was required to pursue his claim in the usual manner, that the earlier factual findings made by the Court of Claims were not necessarily rendered conclusive by the Act, and that, even if Congress had stipulated to the facts, it was still a judicial function for the Court of Claims to render judgment on consent. *Id.,* at 10–12.

To be sure, the Court in *Pope* specifically declined to consider "just what application the principles announced in the *Klein* case could rightly be given to a case in which Congress sought, *pendente lite,* to set aside the judgment of the Court of Claims in favor of the Government and to require relitigation of the suit." *Id.,* at 8–9. The case before us might be viewed as presenting that question. We conclude, however, that the separation-of-powers question presented in this case has already been answered in *Cherokee Nation,* and that that answer is completely consistent with the principles articulated in *Klein.*

The decision in *United States* v. *Klein,* 13 Wall. 128 (1872), arose from the following facts: Klein was the administrator of the estate of V. F. Wilson, the deceased owner of property that had been sold by agents of the Government during the War Between the States. Klein sued the United States in the Court of Claims for the proceeds of that sale. His lawsuit was based on the Abandoned and Captured Property Act of March 3, 1863, 12 Stat. 820, which afforded such a cause of action to noncombatant property owners upon proof that they had "never given any aid or comfort to the present rebellion." Following the enactment of this legislation, President Lincoln had issued a proclamation granting "a full pardon" to certain persons engaged "in the existing rebellion" who desired to resume their allegiance to the Government, upon the condition that they take and maintain a prescribed

oath. This pardon was to have the effect of restoring those persons' property rights. See 13 Stat. 737. The Court of Claims held that Wilson's taking of the amnesty oath had cured his participation in "the . . . rebellion," and that his administrator, Klein, was thus entitled to the proceeds of the sale. *Wilson* v. *United States,* 4 Ct. Cl. 559 (1869).

The Court of Claims' decision in Klein's case was consistent with this Court's later decision in a similar case, *United States* v. *Padelford,* 9 Wall. 531 (1870), holding that the Presidential pardon purged a participant "of whatever offence against the laws of the United States he had committed . . . and relieved [him] from any penalty which he might have incurred." *Id.,* at 543. Following the Court's announcement of the judgment in *Padelford,* however, Congress enacted a proviso to the appropriations bill for the Court of Claims. The proviso had three effects: First, no Presidential pardon or amnesty was to be admissible in evidence on behalf of a claimant in the Court of Claims as the proof of loyalty required by the Abandoned and Captured Property Act. Second, the Supreme Court was to dismiss, for want of jurisdiction, any appeal from a judgment of the Court of Claims in favor of a claimant who had established his loyalty through a pardon. Third, the Court of Claims henceforth was to treat a claimant's receipt of a Presidential pardon, without protest, as conclusive evidence that he had given aid and comfort to the rebellion, and to dismiss any lawsuit on his behalf for want of jurisdiction. Act of July 12, 1870, ch. 251, 16 Stat. 230, 235.

The Government's appeal from the judgment in Klein's case was decided by this Court following the enactment of the appropriations proviso. This Court held the proviso unconstitutional notwithstanding Congress' recognized power "to make 'such exceptions from the appellate jurisdiction' [of the Supreme Court] as should seem to it expedient." 13 Wall., at 145. See U. S. Const., Art. III, § 2, cl. 2. This

holding followed from the Court's interpretation of the proviso's effect:

> "[T]he language of the proviso shows plainly that it does not intend to withhold appellate jurisdiction except as a means to an end. Its great and controlling purpose is to deny to pardons granted by the President the effect which this court had adjudged them to have." 13 Wall., at 145.

Thus construed, the proviso was unconstitutional in two respects: First, it prescribed a rule of decision in a case pending before the courts, and did so in a manner that required the courts to decide a controversy in the Government's favor.

> "The court is required to ascertain the existence of certain facts and thereupon to declare that its jurisdiction on appeal has ceased, by dismissing the bill. What is this but to prescribe a rule for the decision of a cause in a particular way? In the case before us, the Court of Claims has rendered judgment for the claimant and an appeal has been taken to this court. We are directed to dismiss the appeal, if we find that the judgment must be affirmed, because of a pardon granted to the intestate of the claimants. Can we do so without allowing one party to the controversy to decide it in its own favor? Can we do so without allowing that the legislature may prescribe rules of decision to the Judicial Department of the government in cases pending before it?
>
> . . . . .
>
> ". . . Can [Congress] prescribe a rule in conformity with which the court must deny to itself the jurisdiction thus conferred, because and only because its decision, in accordance with settled law, must be adverse to the government and favorable to the suitor? This question seems to us to answer itself." *Id.*, at 146–147.

Second, the rule prescribed by the proviso "is also liable to just exception as impairing the effect of a pardon, and thus

infringing the constitutional power of the Executive." *Id.*, at 147. The Court held that it would not serve as an instrument toward the legislative end of changing the effect of a Presidential pardon. *Id.*, at 148.

It was, of course, the former constitutional objection held applicable to the legislative proviso in *Klein* that the Court was concerned about in *Pope.* But that objection is not applicable to the case before us for two reasons. First, of obvious importance to the *Klein* holding was the fact that Congress was attempting to decide the controversy at issue in the Government's own favor. Thus, Congress' action could not be grounded upon its broad power to recognize and pay the Nation's debts. Second, and even more important, the proviso at issue in *Klein* had attempted "to prescribe a rule for the decision of a cause in a particular way." 13 Wall., at 146. The amendment at issue in the present case, however, like the Special Act at issue in *Cherokee Nation,* waived the defense of res judicata so that a legal claim could be resolved on the merits. Congress made no effort in either instance to control the Court of Claims' ultimate decision of that claim. See n. 23, *supra.*[25]

---

[25] Before completing our analysis of this Court's precedents in this area, we turn to the question whether the holdings in *Cherokee Nation, Nock,* and *Pope,* might have been based on views, once held by this Court, that the Court of Claims was not, in all respects, an Art. III court, and that claims against the United States were not within Art. III's extension of "judicial Power" "to Controversies to which the United States shall be a Party." U. S. Const., Art. III, § 2, cl. 1. See *Williams* v. *United States,* 289 U. S. 553 (1933).

*Pope* itself would seem to dispel any such conclusion. See 323 U. S., at 12–14. Moreover, Mr. Justice Harlan's plurality opinion announcing the judgment of the Court in *Glidden Co.* v. *Zdanok,* 370 U. S. 530 (1962), lays that question to rest. In *Glidden,* the plurality observed that "it is probably true that Congress devotes a more lively attention to the work performed by the Court of Claims, and that it has been more prone to modify the jurisdiction assigned to that court." *Id.,* at 566. But they concluded that that circumstance did not render the decisions of

## C

When Congress enacted the amendment directing the Court of Claims to review the merits of the Black Hills claim, it neither brought into question the finality of that court's earlier judgments, nor interfered with that court's judicial function in deciding the merits of the claim. When the Sioux returned to the Court of Claims following passage of the

the Court of Claims legislative in character, nor, impliedly, did those instances of "lively attention" constitute impermissible interferences with the Court of Claims' judicial functions.

"Throughout its history the Court of Claims has frequently been given jurisdiction by special act to award recovery for breach of what would have been, on the part of an individual, at most a moral obligation. . . . Congress has waived the benefit of res judicata, Cherokee Nation v. United States, 270 U. S. 476, 486, and of defenses based on the passage of time. . . .

"In doing so, as this Court has uniformly held, Congress has enlisted the aid of judicial power whose exercise is amenable to appellate review here. . . . Indeed the Court has held that Congress may for reasons adequate to itself confer bounties upon persons and, by consenting to suit, convert their moral claim into a legal one enforceable by litigation in an undoubted constitutional court. United States v. Realty Co., 163 U. S. 427.

"The issue was settled beyond peradventure in Pope v. United States, 323 U. S. 1. There the Court held that for Congress to direct the Court of Claims to entertain a claim theretofore barred for any legal reason from recovery—as, for instance, by the statute of limitations, or because the contract had been drafted to exclude such claims—was to invoke the use of judicial power, notwithstanding that the task might involve no more than computation of the sum due. . . . After this decision it cannot be doubted that when Congress transmutes a moral obligation into a legal one by specially consenting to suit, it authorizes the tribunal that hears the case to perform a judicial function." Id., at 566–567.

The Court in Glidden held that, at least since 1953, the Court of Claims has been an Art. III court. See id., at 585–589 (opinion concurring in result). In his opinion concurring in the result, Mr. Justice Clark did not take issue with the plurality's view that suits against the United States are "Controversies to which the United States shall be a Party," within the meaning of Art. III. Compare 370 U. S., at 562–565 (plurality opinion), with id., at 586–587 (opinion concurring in result).

amendment, they were there in pursuit of judicial enforcement of a new legal right. Congress had not "reversed" the Court of Claims' holding that the claim was barred by res judicata, nor, for that matter, had it reviewed the 1942 decision rejecting the Sioux' claim on the merits. As Congress explicitly recognized, it only was providing a forum so that a new judicial review of the Black Hills claim could take place. This review was to be based on the facts found by the Court of Claims after reviewing all the evidence, and an application of generally controlling legal principles to those facts. For these reasons, Congress was not reviewing the merits of the Court of Claims' decisions, and did not interfere with the finality of its judgments.

Moreover, Congress in no way attempted to prescribe the outcome of the Court of Claims' new review of the merits. That court was left completely free to reaffirm its 1942 judgment that the Black Hills claim was not cognizable under the Fifth Amendment, if upon its review of the facts and law, such a decision was warranted. In this respect, the amendment before us is a far cry from the legislatively enacted "consent judgment" called into question in *Pope,* yet found constitutional as a valid exercise of Congress' broad power to pay the Nation's debts. And, for the same reasons, this amendment clearly is distinguishable from the proviso to this Court's appellate jurisdiction held unconstitutional in *Klein.*

In sum, as this Court implicitly held in *Cherokee Nation,* Congress' mere waiver of the res judicata effect of a prior judicial decision rejecting the validity of a legal claim against the United States does not violate the doctrine of separation of powers.

## IV

### A

In reaching its conclusion that the 1877 Act effected a taking of the Black Hills for which just compensation was due the Sioux under the Fifth Amendment, the Court of Claims

relied upon the "good faith effort" test developed in its earlier decision in *Three Tribes of Fort Berthold Reservation* v. *United States,* 182 Ct. Cl. 543, 390 F. 2d 686 (1968). The *Fort Berthold* test had been designed to reconcile two lines of cases decided by this Court that seemingly were in conflict. The first line, exemplified by *Lone Wolf* v. *Hitchcock,* 187 U. S. 553 (1903), recognizes "that Congress possesse[s] a paramount power over the property of the Indians, by reason of its exercise of guardianship over their interests, and that such authority might be implied, even though opposed to the strict letter of a treaty with the Indians." *Id.,* at 565. The second line, exemplified by the more recent decision in *Shoshone Tribe* v. *United States,* 299 U. S. 476 (1937), concedes Congress' paramount power over Indian property, but holds, nonetheless, that "[t]he power does not extend so far as to enable the Government 'to give the tribal lands to others, or to appropriate them to its own purposes, without rendering, or assuming an obligation to render, just compensation.' " *Id.,* at 497 (quoting *United States* v. *Creek Nation,* 295 U. S. 103, 110 (1935)). In *Shoshone Tribe,* Mr. Justice Cardozo, in speaking for the Court, expressed the distinction between the conflicting principles in a characteristically pithy phrase: "Spoliation is not management." 299 U. S., at 498.

The *Fort Berthold* test distinguishes between cases in which one or the other principle is applicable:

> "It is obvious that Congress cannot simultaneously (1) act as trustee for the benefit of the Indians, exercising its plenary powers over the Indians and their property, as it thinks is in their best interests, and (2) exercise its sovereign power of eminent domain, taking the Indians' property within the meaning of the Fifth Amendment to the Constitution. In any given situation in which Congress has acted with regard to Indian people, it must have acted either in one capacity or the other. Congress can own two hats, but it cannot wear them both at the same time.

"Some guideline must be established so that a court can identify in which capacity Congress is acting. The following guideline would best give recognition to the basic distinction between the two types of congressional action: Where Congress makes a good faith effort to give the Indians the full value of the land and thus merely transmutes the property from land to money, there is no taking. This is a mere substitution of assets or change of form and is a traditional function of a trustee." 182 Ct. Cl., at 553, 390 F. 2d, at 691.

Applying the *Fort Berthold* test to the facts of this case, the Court of Claims concluded that, in passing the 1877 Act, Congress had not made a good-faith effort to give the Sioux the full value of the Black Hills. The principal issue presented by this case is whether the legal standard applied by the Court of Claims was erroneous.[26]

## B

The Government contends that the Court of Claims erred insofar as its holding that the 1877 Act effected a taking of the Black Hills was based on Congress' failure to indicate affirmatively that the consideration given the Sioux was of

---

[26] It should be recognized at the outset that the inquiry presented by this case is different from that confronted in the more typical of our recent "taking" decisions. *E. g., Kaiser Aetna* v. *United States,* 444 U. S. 164 (1979); *Penn Central Transp. Co.* v. *New York City,* 438 U. S. 104 (1978). In those cases the Court has sought to "determin[e] when 'justice and fairness' require that economic injuries caused by public action be compensated by the government, rather than remain disproportionately concentrated on a few persons." *Penn Central,* 438 U. S., at 124. Here, there is no doubt that the Black Hills were "taken" from the Sioux in a way that wholly deprived them of their property rights to that land. The question presented is whether Congress was acting under circumstances in which that "taking" implied an obligation to pay just compensation, or whether it was acting pursuant to its unique powers to manage and control tribal property as the guardian of Indian welfare, in which event the Just Compensation Clause would not apply.

equivalent value to the property rights ceded to the Government. It argues that "the true rule is that Congress must be assumed to be acting within its plenary power to manage tribal assets if it reasonably can be concluded that the legislation was intended to promote the welfare of the tribe." Brief for United States 52. The Government derives support for this rule principally from this Court's decision in *Lone Wolf* v. *Hitchcock.*

In *Lone Wolf,* representatives of the Kiowa, Comanche, and Apache Tribes brought an equitable action against the Secretary of the Interior and other governmental officials to enjoin them from enforcing the terms of an Act of Congress that called for the sale of lands held by the Indians pursuant to the Medicine Lodge Treaty of 1867, 15 Stat. 581. That treaty, like the Fort Laramie Treaty of 1868, included a provision that any future cession of reservation lands would be without validity or force "unless executed and signed by at least three fourths of all the adult male Indians occupying the same." *Id.,* at 585. The legislation at issue, Act of June 6, 1900, 31 Stat. 672, was based on an agreement with the Indians that had not been signed by the requisite number of adult males residing on the reservation.

This Court's principal holding in *Lone Wolf* was that "the legislative power might pass laws in conflict with treaties made with the Indians." 187 U. S., at 566. The Court stated:

"The power exists to abrogate the provisions of an Indian treaty, though presumably such power will be exercised only when circumstances arise which will not only justify the government in disregarding the stipulations of the treaty, but may demand, in the interest of the country and the Indians themselves, that it should do so. When, therefore, treaties were entered into between the United States and a tribe of Indians it was never doubted that the *power* to abrogate existed in Con-

gress, and that in a contingency such power might be availed of from considerations of governmental policy, particularly if consistent with perfect good faith towards the Indians." *Ibid.* (Emphasis in original.) [27]

The Court, therefore, was not required to consider the contentions of the Indians that the agreement ceding their lands had been obtained by fraud, and had not been signed by the requisite number of adult males. "[A]ll these matters, in any event, were solely within the domain of the legislative authority and its action is conclusive upon the courts." *Id.,* at 568.

In the penultimate paragraph of the opinion, however, the Court in *Lone Wolf* went on to make some observations seemingly directed to the question whether the Act at issue might constitute a taking of Indian property without just compensation. The Court there stated:

"The act of June 6, 1900, which is complained of in the bill, was enacted at a time when the tribal relations between the confederated tribes of Kiowas, Comanches and Apaches still existed, and that statute and the statutes supplementary thereto dealt with the disposition of tribal property and purported to give an adequate consideration for the surplus lands not allotted among the Indians or reserved for their benefit. Indeed, the controversy which this case presents is concluded by the decision in *Cherokee Nation* v. *Hitchcock,* 187 U. S. 294, decided at this term, where it was held that full administrative power was possessed by Congress over Indian

---

[27] This aspect of the *Lone Wolf* holding, often reaffirmed, see, *e. g., Rosebud Sioux Tribe* v. *Kneip,* 430 U. S. 584, 594 (1977), is not at issue in this case. The Sioux do not claim that Congress was without power to take the Black Hills from them in contravention of the Fort Laramie Treaty of 1868. They claim only that Congress could not do so inconsistently with the command of the Fifth Amendment: "nor shall private property be taken for public use, without just compensation."

tribal property. In effect, the action of Congress now complained of was but an exercise of such power, a mere change in the form of investment of Indian tribal property, the property of those who, as we have held, were in substantial effect the wards of the government. *We must presume that Congress acted in perfect good faith in the dealings with the Indians of which complaint is made, and that the legislative branch of the government exercised its best judgment in the premises.* In any event, as Congress possessed full power in the matter, the judiciary cannot question or inquire into the motives which prompted the enactment of this legislation. If injury was occasioned, which we do not wish to be understood as implying, by the use made by Congress of its power, relief must be sought by an appeal to that body for redress and not to the courts. The legislation in question was constitutional." *Ibid.* (Emphasis supplied.)

The Government relies on the italicized sentence in the quotation above to support its view "that Congress must be assumed to be acting within its plenary power to manage tribal assets if it reasonably can be concluded that the legislation was intended to promote the welfare of the tribe." Brief for United States 52. Several adjoining passages in the paragraph, however, lead us to doubt whether the *Lone Wolf* Court meant to state a general rule applicable to cases such as the one before us.

First, *Lone Wolf* presented a situation in which Congress "purported to give an adequate consideration" for the treaty lands taken from the Indians. In fact, the Act at issue set aside for the Indians a sum certain of $2 million for surplus reservation lands surrendered to the United States. 31 Stat. 678; see 187 U. S., at 555. In contrast, the background of the 1877 Act "reveals a situation where Congress did not 'purport' to provide 'adequate consideration,' nor was there

any meaningful negotiation or arm's-length bargaining, nor did Congress consider it was paying a fair price." 220 Ct. Cl., at 475, 601 F. 2d, at 1176 (concurring opinion).

Second, given the provisions of the Act at issue in *Lone Wolf*, the Court reasonably was able to conclude that "the action of Congress now complained of was but . . . a mere change in the form of investment of Indian tribal property." Under the Act of June 6, 1900, each head of a family was to be allotted a tract of land within the reservation of not less than 320 acres, an additional 480,000 acres of grazing land were set aside for the use of the tribes in common, and $2 million was paid to the Indians for the remaining surplus. 31 Stat. 677–678. In contrast, the historical background to the opening of the Black Hills for settlement, and the terms of the 1877 Act itself, see Part I, *supra,* would not lead one to conclude that the Act effected "a mere change in the form of investment of Indian tribal property."

Third, it seems significant that the views of the Court in *Lone Wolf* were based, in part, on a holding that "Congress possessed full power in the matter." Earlier in the opinion the Court stated: "Plenary authority over the tribal relations of the Indians has been exercised by Congress from the beginning, and the power has always been deemed a political one, not subject to be controlled by the judicial department of the government." 187 U. S., at 565. Thus, it seems that the Court's conclusive presumption of congressional good faith was based in large measure on the idea that relations between this Nation and the Indian tribes are a political matter, not amenable to judicial review. That view, of course, has long since been discredited in takings cases, and was expressly laid to rest in *Delaware Tribal Business Comm.* v. *Weeks,* 430 U. S. 73, 84 (1977).[28]

---

[28] For this reason, the Government does not here press *Lone Wolf* to its logical limits, arguing instead that its "strict rule" that the management and disposal of tribal lands is a political question, "has been relaxed

Fourth, and following up on the political question holding, the *Lone Wolf* opinion suggests that where the exercise of congressional power results in injury to Indian rights, "relief must be sought by an appeal to that body for redress and not to the courts." Unlike *Lone Wolf,* this case is one in which the Sioux have sought redress from Congress, and the Legislative Branch has responded by referring the matter to the courts for resolution. See Parts II and III, *supra.* Where Congress waives the Government's sovereign immunity, and expressly directs the courts to resolve a taking claim on the merits, there would appear to be far less reason to apply *Lone Wolf*'s principles of deference. See *United States* v. *Tillamooks,* 329 U. S. 40, 46 (1946) (plurality opinion).

The foregoing considerations support our conclusion that the passage from *Lone Wolf* here relied upon by the Government has limited relevance to this case. More significantly, *Lone Wolf*'s presumption of congressional good faith has little to commend it as an enduring principle for deciding questions

in recent years to allow review under the Fifth Amendment rational-basis test." Brief for United States 55, n. 46. The Government relies on *Delaware Tribal Business Comm.* v. *Weeks,* 430 U. S., at 84–85, and *Morton* v. *Mancari,* 417 U. S. 535, 555 (1974), as establishing a rational-basis test for determining whether Congress, in a given instance, confiscated Indian property or engaged merely in its power to manage and dispose of tribal lands in the Indians' best interests. But those cases, which establish a standard of review for judging the constitutionality of Indian legislation under the Due Process Clause of the Fifth Amendment, do not provide an apt analogy for resolution of the issue presented here—whether Congress' disposition of tribal property was an exercise of its power of eminent domain or its power of guardianship. As noted earlier, n. 27, *supra,* the Sioux concede the constitutionality of Congress' unilateral abrogation of the Fort Laramie Treaty. They seek only a holding that the Black Hills "were appropriated by the United States in circumstances which involved an implied undertaking by it to make just compensation to the tribe." *United States* v. *Creek Nation,* 295 U. S. 103, 111 (1935). The rational-basis test proffered by the Government would be ill-suited for use in determining whether such circumstances were presented by the events culminating in the passage of the 1877 Act.

of the kind presented here. In every case where a taking of treaty-protected property is alleged,[29] a reviewing court must recognize that tribal lands are subject to Congress' power to control and manage the tribe's affairs. But the court must also be cognizant that "this power to control and manage [is] not absolute. While extending to all appropriate measures for protecting and advancing the tribe, it [is] subject to limitations inhering in . . . a guardianship and to pertinent constitutional restrictions." *United States* v. *Creek Nation,* 295 U. S., at 109–110. Accord: *Menominee Tribe* v. *United States,* 391 U. S. 404, 413 (1968); *FPC* v. *Tuscarora Indian Nation,* 362 U. S. 99, 122 (1960); *United States* v. *Klamath Indians,* 304 U. S. 119, 123 (1938); *United States* v. *Shoshone Tribe,* 304 U. S. 111, 115–116 (1938); *Shoshone Tribe* v. *United States,* 299 U. S. 476, 497–498 (1937).

As the Court of Claims recognized in its decision below, the question whether a particular measure was appropriate for protecting and advancing the tribe's interests, and therefore not subject to the constitutional command of the Just Compensation Clause, is factual in nature. The answer must be based on a consideration of all the evidence presented. We do not mean to imply that a reviewing court is to second-guess, from the perspective of hindsight, a legislative judgment that a particular measure would serve the best interests of the tribe. We do mean to require courts, in considering whether a particular congressional action was taken in pursuance of Congress' power to manage and control tribal lands

---

[29] Of course, it has long been held that the taking by the United States of "unrecognized" or "aboriginal" Indian title is not compensable under the Fifth Amendment. *Tee-Hit-Ton Indians* v. *United States,* 348 U. S. 272, 285 (1955). The principles we set forth today are applicable only to instances in which "Congress by treaty or other agreement has declared that thereafter Indians were to hold the lands permanently." *Id.,* at 277. In such instances, "compensation must be paid for subsequent taking." *Id.,* at 277–278.

for the Indians' welfare, to engage in a thoroughgoing and impartial examination of the historical record. A presumption of congressional good faith cannot serve to advance such an inquiry.

## C

We turn to the question whether the Court of Claims' inquiry in this case was guided by an appropriate legal standard. We conclude that it was. In fact, we approve that court's formulation of the inquiry as setting a standard that ought to be emulated by courts faced with resolving future cases presenting the question at issue here:

> "In determining whether Congress has made a good faith effort to give the Indians the full value of their lands when the government acquired [them], we therefore look to the objective facts as revealed by Acts of Congress, congressional committee reports, statements submitted to Congress by government officials, reports of special commissions appointed by Congress to treat with the Indians, and similar evidence relating to the acquisition. . . .

> "The 'good faith effort' and 'transmutation of property' concepts referred to in *Fort Berthold* are opposite sides of the same coin. They reflect the traditional rule that a trustee may change the form of trust assets as long as he fairly (or in good faith) attempts to provide his ward with property of equivalent value. If he does that, he cannot be faulted if hindsight should demonstrate a lack of precise equivalence. On the other hand, if a trustee (or the government in its dealings with the Indians) does not attempt to give the ward the fair equivalent of what he acquires from him, the trustee to that extent has taken rather than transmuted the property of the ward. In other words, an essential element of the inquiry under the *Fort Berthold* guideline is determining the adequacy of the consideration the government gave for the Indian lands it acquired. That in-

quiry cannot be avoided by the government's simple assertion that it acted in good faith in its dealings with the Indians." 220 Ct. Cl., at 451, 601 F. 2d, at 1162.[30]

### D

We next examine the factual findings made by the Court of Claims, which led it to the conclusion that the 1877 Act effected a taking. First, the Court found that "[t]he only item of 'consideration' that possibly could be viewed as showing an attempt by Congress to give the Sioux the 'full value' of the land the government took from them was the requirement to furnish them with rations until they became self-sufficient." 220 Ct. Cl., at 458, 601 F. 2d, at 1166. This finding is fully supported by the record, and the Government does not seriously contend otherwise.[31]

[30] An examination of this standard reveals that, contrary to the Government's assertion, the Court of Claims in this case did not base its finding of a taking solely on Congress' failure in 1877 to state affirmatively that the "assets" given the Sioux in exchange for the Black Hills were equivalent in value to the land surrendered. Rather, the court left open the possibility that, in an appropriate case, a mere assertion of congressional good faith in setting the terms of a forced surrender of treaty-protected lands could be overcome by objective indicia to the contrary. And, in like fashion, there may be instances in which the consideration provided the Indians for surrendered treaty lands was so patently adequate and fair that Congress' failure to state the obvious would not result in the finding of a compensable taking.

To the extent that the Court of Claims' standard, in this respect, departed from the original formulation of the *Fort Berthold* test, see 220 Ct. Cl., at 486–487, 601 F. 2d, at 1182–1183 (dissenting opinion), such a departure was warranted. The Court of Claims' present formulation of the test, which takes into account the adequacy of the consideration given, does little more than reaffirm the ancient principle that the determination of the measure of just compensation for a taking of private property "is a judicial and not a legislative question." *Monongahela Navigation Co.* v. *United States*, 148 U. S. 312, 327 (1893).

[31] The 1877 Act, see *supra*, at 382–383, and n. 14, purported to provide the Sioux with "all necessary aid to assist the said Indians in the work of civilization," and "to furnish to them schools and instruction in mechani-

Second, the court found, after engaging in an exhaustive review of the historical record, that neither the Manypenny Commission, nor the congressional Committees that approved the 1877 Act, nor the individual legislators who spoke on its behalf on the floor of Congress, ever indicated a belief that the Government's obligation to provide the Sioux with rations constituted a fair equivalent for the value of the Black Hills and the additional property rights the Indians were forced to

---

cal and agricultural arts, as provided for by the treaty of 1868." 19 Stat. 256. The Court of Claims correctly concluded that the first item "was so vague that it cannot be considered as constituting a meaningful or significant element of payment by the United States." 220 Ct. Cl., at 458, 601 F. 2d, at 1166. As for the second, it "gave the Sioux nothing to which they were not already entitled [under the 1868 treaty]." *Ibid.*

The Government has placed some reliance in this Court on the fact that the 1877 Act extended the northern boundaries of the reservation by adding some 900,000 acres of grazing lands. See n. 14, *supra.* In the Court of Claims, however, the Government did "not contend . . . that the transfer of this additional land was a significant element of the consideration the United States gave for the Black Hills." 220 Ct. Cl., at 453, n. 3, 601 F. 2d, at 1163, n. 3. And Congress obviously did not intend the extension of the reservation's northern border to constitute consideration for the property rights surrendered by the Sioux. The extension was effected in that article of the Act redefining the reservation's borders; it was not mentioned in the article which stated the consideration given for the Sioux' "cession of territory and rights." See 19 Stat. 255–256. Moreover, our characterizing the 900,000 acres as assets given the Sioux in consideration for the property rights they ceded would not lead us to conclude that the terms of the exchange were "so patently adequate and fair" that a compensable taking should not have been found. See n. 30, *supra.*

Finally, we note that the Government does not claim that the Indian Claims Commission and the Court of Claims incorrectly valued the property rights taken by the 1877 Act by failing to consider the extension of the northern border. Rather, the Government argues only that the 900,000 acres should be considered, along with the obligation to provide rations, in determining whether the Act, viewed in its entirety, constituted a good-faith effort on the part of Congress to promote the Sioux' welfare. See Brief for United States 73, and n. 58.

surrender.  See *id.*, at 458–462, 601 F. 2d, at 1166–1168. This finding is unchallenged by the Government.

A third finding lending some weight to the Court's legal conclusion was that the conditions placed by the Government on the Sioux' entitlement to rations, see n. 14; *supra,* "further show that the government's undertaking to furnish rations to the Indians until they could support themselves did not reflect a congressional decision that the value of the rations was the equivalent of the land the Indians were giving up, but instead was an attempt to coerce the Sioux into capitulating to congressional demands."  220 Ct. Cl., at 461, 601 F. 2d, at 1168.  We might add only that this finding is fully consistent with similar observations made by this Court nearly a century ago in an analogous case.

In *Choctaw Nation* v. *United States,* 119 U. S. 1, 35 (1886), the Court held, over objections by the Government, that an earlier award made by the Senate on an Indian tribe's treaty claim "was fair, just, and equitable."  The treaty at issue had called for the removal of the Choctaw Nation from treaty-protected lands in exchange for payments for the tribe's subsistence for one year, payments for cattle and improvements on the new reservation, an annuity of $20,000 for 20 years commencing upon removal, and the provision of educational and agricultural services.  *Id.,* at 38.  Some years thereafter the Senate had awarded the Indians a substantial recovery based on the latter treaty's failure to compensate the Choctaw for the lands they had ceded.  Congress later enacted a jurisdictional statute which permitted the United States to contest the fairness of the Senate's award as a settlement of the Indian's treaty claim.  In rejecting the Government's arguments, and accepting the Senate's award as "furnish[ing] the nearest approximation to the justice and right of the case," *id.,* at 35, this Court observed:

> "It is notorious as a historical fact, as it abundantly appears from the record in this case, that great pressure

had to be brought to bear upon the Indians to effect their removal, and the whole treaty was evidently and purposely executed, not so much to secure to the Indians the rights for which they had stipulated, as to effectuate the policy of the United States in regard to their removal. The most noticeable thing, upon a careful consideration of the terms of this treaty, is, that no money consideration is promised or paid for a cession of lands, the beneficial ownership of which is assumed to reside in the Choctaw Nation, and computed to amount to over ten millions of acres." *Id.,* at 37–38.

As for the payments that had been made to the Indians in order to induce them to remove themselves from their treaty lands, the Court, in words we find applicable to the 1877 Act, concluded:

"It is nowhere expressed in the treaty that these payments are to be made as the price of the lands ceded; and they are all only such expenditures as the government of the United States could well afford to incur for the mere purpose of executing its policy in reference to the removal of the Indians to their new homes. *As a consideration for the value of the lands ceded by the treaty, they must be regarded as a meagre pittance."* *Id.,* at 38 (emphasis supplied).

These conclusions, in light of the historical background to the opening of the Black Hills for settlement, see Part I, *supra,* seem fully applicable to Congress' decision to remove the Sioux from that valuable tract of land, and to extinguish their off-reservation hunting rights.

Finally, the Court of Claims rejected the Government's contention that the fact that it subsequently had spent at least $43 million on rations for the Sioux (over the course of three-quarters of a century) established that the 1877 Act was an act of guardianship taken in the Sioux' best interest. The court concluded: "The critical inquiry is what Congress

did—and how it viewed the obligation it was assuming—at the time it acquired the land, and not how much it ultimately cost the United States to fulfill the obligation." 220 Ct. Cl., at 462, 601 F. 2d, at 1168. It found no basis for believing that Congress, in 1877, anticipated that it would take the Sioux such a lengthy period of time to become self-sufficient, or that the fulfillment of the Government's obligation to feed the Sioux would entail the large expenditures ultimately made on their behalf. *Ibid.* We find no basis on which to question the legal standard applied by the Court of Claims, or the findings it reached, concerning Congress' decision to provide the Sioux with rations.

### E

The aforementioned findings fully support the Court of Claims' conclusion that the 1877 Act appropriated the Black Hills "in circumstances which involved an implied undertaking by [the United States] to make just compensation to the tribe." [32] *United States* v. *Creek Nation,* 295 U. S., at 111.

---

[32] The dissenting opinion suggests, *post,* at 434–437, that the factual findings of the Indian Claims Commission, the Court of Claims, and now this Court, are based upon a "revisionist" view of history. The dissent fails to identify which materials quoted herein or relied upon by the Commission and the Court of Claims fit that description. The dissent's allusion to historians "writing for the purpose of having their conclusions or observations inserted in the reports of congressional committees," *post,* at 435, is also puzzling because, with respect to this case, we are unaware that any such historian exists.

The primary sources for the story told in this opinion are the factual findings of the Indian Claims Commission and the Court of Claims. A reviewing court generally will not discard such findings because they raise the specter of creeping revisionism, as the dissent would have it, but will do so only when they are clearly erroneous and unsupported by the record. No one, including the Government, has ever suggested that the factual findings of the Indian Claims Commission and the Court of Claims fail to meet that standard of review.

A further word seems to be in order. The dissenting opinion does not identify a single author, nonrevisionist, neorevisionist, or otherwise, who

We make only two additional observations about this case. First, dating at least from the decision in *Cherokee Nation* v. *Southern Kansas R. Co.*, 135 U. S. 641, 657 (1890), this Court has recognized that Indian lands, to which a tribe holds recognized title, "are held subject to the authority of the general government to take them for such objects as are germane to the execution of the powers granted to it; provided only, that they are not taken without just compensation being made to the owner." In the same decision the Court emphasized that the owner of such lands "is entitled to reasonable, certain and adequate provision for obtaining compensation before his occupancy is disturbed." *Id.*, at 659. The Court of Claims gave effect to this principle when it held that the Government's uncertain and indefinite obligation to provide the Sioux with rations until they became self-sufficient did not constitute adequate consideration for the Black Hills.

Second, it seems readily apparent to us that the obligation to provide rations to the Sioux was undertaken in order to ensure them a means of surviving their transition from the nomadic life of the hunt to the agrarian lifestyle Congress had chosen for them. Those who have studied the Government's reservation policy during this period of our Nation's history agree. See n. 11, *supra.* It is important to recognize

---

takes the view of the history of the cession of the Black Hills that the dissent prefers to adopt, largely, one assumes, as an article of faith. Rather, the dissent relies on the historical findings contained in the decision rendered by the Court of Claims in 1942. That decision, and those findings, are not before this Court today. Moreover, the holding of the Court of Claims in 1942, to the extent the decision can be read as reaching the merits of the Sioux' taking claim, was based largely on the conclusive presumption of good faith toward the Indians which that court afforded to Congress' actions of 1877. See 97 Ct. Cl., at 669–673, 685. The divergence of results between that decision and the judgment of the Court of Claims affirmed today, which the dissent would attribute to historical revisionism, see *post*, at 434–435, is more logically explained by the fact that the former decision was based on an erroneous *legal* interpretation of this Court's opinion in *Lone Wolf*. See Part IV–B, *supra.*

that the 1877 Act, in addition to removing the Black Hills from the Great Sioux Reservation, also ceded the Sioux' hunting rights in a vast tract of land extending beyond the boundaries of that reservation. See n. 14, *supra.* Under such circumstances, it is reasonable to conclude that Congress' undertaking of an obligation to provide rations for the Sioux was a *quid pro quo* for depriving them of their chosen way of life, and was not intended to compensate them for the taking of the Black Hills.[33]

## V

In sum, we conclude that the legal analysis and factual findings of the Court of Claims fully support its conclusion that the terms of the 1877 Act did not effect "a mere change in the form of investment of Indian tribal property." *Lone*

---

[33] We find further support for this conclusion in Congress' 1974 amendment to § 2 of the Indian Claims Commission Act, 25 U. S. C. § 70a. See n. 17, *supra.* That amendment provided that in determining offsets, "expenditures for food, rations, or provisions shall not be deemed payments on the claim." The Report of the Senate Committee on Interior and Insular Affairs, which accompanied this amendment, made two points that are pertinent here. First, it noted that "[a]lthough couched in general terms, this amendment is directed to one basic objective—expediting the Indian Claims Commission's disposition of the famous Black Hills case." S. Rep. No. 93–863, p. 2 (1974) (incorporating memorandum prepared by the Sioux Tribes). Second, the Committee observed:

"The facts are, as the Commission found, that the United States disarmed the Sioux and denied them their traditional hunting areas in an effort to force the sale of the Black Hills. Having violated the 1868 Treaty and having reduced the Indians to starvation, the United States should not now be in the position of saying that the rations it furnished constituted payment for the land which it took. In short, the Government committed two wrongs: first, it deprived the Sioux of their livelihood; secondly, it deprived the Sioux of their land. What the United States gave back in rations should not be stretched to cover both wrongs." *Id.,* at 4–5.

See also R. Billington, Introduction, in National Park Service, Soldier and Brave xiv (1963) ("The Indians suffered the humiliating defeats that forced them to walk the white man's road toward civilization. Few conquered people in the history of mankind have paid so dearly for their defense of a way of life that the march of progress had outmoded").

*Wolf* v. *Hitchcock,* 187 U. S., at 568. Rather, the 1877 Act effected a taking of tribal property, property which had been set aside for the exclusive occupation of the Sioux by the Fort Laramie Treaty of 1868. That taking implied an obligation on the part of the Government to make just compensation to the Sioux Nation, and that obligation, including an award of interest, must now, at last, be paid.

The judgment of the Court of Claims is affirmed.

*It is so ordered.*

MR. JUSTICE WHITE, concurring in part and concurring in the judgment.

I agree that there is no constitutional infirmity in the direction by Congress that the Court of Claims consider this case without regard to the defense of res judicata. I also agree that the Court of Claims correctly decided this case. Accordingly, I concur in Parts III and V of the Court's opinion and in the judgment.

MR. JUSTICE REHNQUIST, dissenting.

In 1942, the Sioux Tribe filed a petition for certiorari requesting this Court to review the Court of Claims' ruling that Congress had not unconstitutionally taken the Black Hills in 1877, but had merely exchanged the Black Hills for rations and grazing lands—an exchange Congress believed to be in the best interests of the Sioux and the Nation. This Court declined to review that judgment. *Sioux Tribe* v. *United States,* 97 Ct. Cl. 613 (1942), cert. denied, 318 U. S. 789 (1943). Yet today the Court permits Congress to reopen that judgment which this Court rendered final upon denying certiorari in 1943, and proceeds to reject the 1942 Court of Claims' factual interpretation of the events in 1877. I am convinced that Congress may not constitutionally require the Court of Claims to reopen this proceeding, that there is no judicial principle justifying the decision to afford the respondents an additional

opportunity to litigate the same claim, and that the Court of Claims' first interpretation of the events in 1877 was by all accounts the more realistic one. I therefore dissent.

## I

In 1920, Congress enacted a special jurisdictional Act, ch. 222, 41 Stat. 738, authorizing the Sioux Tribe to submit any legal or equitable claim against the United States to the Court of Claims. The Sioux filed suit claiming that the 1877 Act removing the Black Hills from the Sioux territory was an unconstitutional taking. In *Sioux Tribe* v. *United States, supra,* the Court of Claims considered the question fully and found that the United States had not taken the Black Hills from the Sioux within the meaning of the Fifth Amendment. It is important to highlight what that court found. It did not decide, as the Court today suggests, that it merely lacked jurisdiction over the claim presented by the Sioux. See *ante,* at 384. It found that under the circumstances presented in 1877, Congress attempted to improve the situation of the Sioux and the Nation by exchanging the Black Hills for 900,000 acres of grazing lands and rations for as long as they should be needed. The court found that although the Government attempted to keep white settlers and gold prospectors out of the Black Hills territory, these efforts were unsuccessful. The court concluded that this situation was such that the Government "believed serious conflicts would develop between the settlers and the Government, and between the settlers and the Indians." 97 Ct. Cl., at 659. It was also apparent to Congress that the Indians were still "incapable of supporting themselves." *Ibid.*

The court found that the Government therefore embarked upon a course designed to obtain the Indians' agreement to sell the Black Hills and "endeavored in every way possible during 1875 and 1876 to arrive at a mutual agreement with the Indians for the sale. . . ." *Id.,* at 681. Negotiation having failed, Congress then turned to design terms for the ac-

quisition of the Black Hills which it found to be in the best interest of both the United States and the Sioux. The court found that pursuant to the 1877 agreement, Congress provided the Indians with more than $43 million in rations as well as providing them with 900,000 acres of needed grazing lands. Thus the court concluded that "the record shows that the action taken was pursuant to a policy which the Congress deemed to be for the interest of the Indians and just to both parties." *Id.*, at 668. The court emphasized:

> "[T]he Congress, in an act enacted because of the situation encountered and pursuant to a policy which in its wisdom it deemed to be in the interest and for the benefit and welfare of the . . . Sioux Tribe, as well as for the necessities of the Government, required the Indians to sell or surrender to the Government a portion of their land and hunting rights on other land in return for that which the Congress, in its judgment, deemed to be adequate consideration for what the Indians were required to give up, which consideration the Government was not otherwise under any legal obligation to pay." *Id.*, at 667.

This Court denied certiorari. 318 U. S. 789 (1943).

During the course of further litigation commencing in 1950, the Sioux again resubmitted their claim that the Black Hills were taken unconstitutionally. The Government pleaded res judicata as a defense. The Court of Claims held that res judicata barred relitigation of the question since the original Court of Claims decision had clearly held that the appropriation of the Black Hills was not a taking because Congress in "exercising its plenary power over Indian tribes, took their land without their consent and substituted for it something conceived by Congress to be an equivalent." *United States v. Sioux Nation,* 207 Ct. Cl. 234, 243, 518 F. 2d 1298, 1303 (1975). The court found no basis for relieving the Sioux from the bar of res judicata finding that the disability "is not lifted if a later court disagrees with a prior one." *Id.*, at 244,

518 F. 2d, at 1303. The court thus considered the equities entailed by the application of res judicata in this case and held that relitigation was unwarranted. Again, this Court denied certiorari. 423 U. S. 1016 (1975).

Congress then passed another statute authorizing the Sioux to relitigate their taking claim in the Court of Claims. 92 Stat. 153. The statute provided that the Court of Claims "*shall* review on the merits" the Sioux claim that there was a taking and that the Court "*shall determine that issue de novo.*" (Emphasis added.) Neither party submitted additional evidence and the Court of Claims decided the case on the basis of the record generated in the 1942 case and before the Commission. On the basis of that same record, the Court of Claims has now determined that the facts establish that Congress did not act in the best interest of the Sioux, as the 1942 court found, but arbitrarily appropriated the Black Hills without affording just compensation. This Court now embraces this second, latter-day interpretation of the facts in 1877.

## II

Although the Court refrains from so boldly characterizing its action, it is obvious from these facts that Congress has reviewed the decisions of the Court of Claims, set aside the judgment that no taking of the Black Hills occurred, set aside the judgment that there is no cognizable reason for relitigating this claim, and ordered a new trial. I am convinced that this is nothing other than an exercise of judicial power reserved to Art. III courts that may not be performed by the Legislative Branch under its Art. I authority.

Article III vests "the judical Power . . . of the United States" in federal courts. Congress is vested by Art. I with *legislative* powers, and may not itself exercise an appellate-type review of judicial judgments in order to alter their terms, or to order new trials of cases already decided. The judges in *Hayburn's Case*, 2 Dall. 409, 413, n. 4 (1792), stated

that "no decision of any court of the United States can, under any circumstances, in our opinion, agreeable to the Constitution, be liable to a reversion, or even suspension, by the Legislature itself, in whom no judicial power of any kind appears to be vested." We have interpreted the decision in *United States* v. *Klein,* 13 Wall. 128 (1872), as having "rested upon the ground that . . . Congress was without constitutional authority to control the exercise of . . . judicial power . . . by requiring this Court to set aside the judgment of the Court of Claims" and as holding that Congress may not "require a new trial of the issues . . . which the Court had resolved against [a party]." *Pope* v. *United States,* 323 U. S. 1, 8, 9 (1944).

This principle was again applied in *United States* v. *O'Grady,* 22 Wall. 641, 647 (1875), where the Court refused to legitimize a congressional attempt to revise a final judgment rendered by the Court of Claims finding that such judgments "are beyond all doubt the final determination of the matter in controversy; and it is equally certain that the judgments of the Court of Claims, where no appeal is taken to this court, are, under existing laws, *absolutely conclusive of the rights of the parties, unless a new trial is granted by that court. . . .*" (Emphasis added.) The Court further found that there is only one Supreme Court and "[i]t is quite clear that Congress cannot subject the judgments of the Supreme Court to the re-examination and revision of any other tribunal or any other department of the government." *Id.,* at 648. See also *Chicago & Southern Air Lines, Inc.* v. *Waterman S. S. Corp.,* 333 U. S. 103 (1948). Congress has exceeded the legislative boundaries drawn by these cases and the Constitution and exercised judicial power in a case already decided by effectively ordering a new trial.

The determination of whether this action is an exercise of legislative or judicial power is of course one of characterization. The fact that the judicial process is affected by an Act of Con-

gress is not dispositive since many actions which this Court has clearly held to be legitimate exercises of legislative authority do have an effect on the judiciary and its processes. Congress may legitimately exercise legislative powers in the regulation of judicial jurisdiction; and it may, like other litigants, change the import of a final judgment by establishing new legal rights after the date of judgment, and have an effect on the grounds available for a court's decision by waiving available defenses. But as the Court apparently concedes, Congress may not, in the name of those legitimate actions, review and set aside a final judgment of an Art. III court, and order the courts to rehear an issue previously decided in a particular case.

The Court relies heavily on the fact that Congress was acting pursuant to its power to pay the Nation's debts. No doubt, Congress has broad power to do just that, but it may do so only through the exercise of legislative, not judicial powers. Thus the question must be, not whether Congress was attempting to pay its debts through this Act, but whether it attempted to do so by means of judicial power. The Court suggests that the congressional action in issue is justified as either a permissible regulation of jurisdiction, the creation of a new obligation, or the mere waiver of a litigant's right. These alternative nonjudicial characterizations of the congressional action, however, are simply unpersuasive.

## A

The Court first attempts to categorize this action as a permissible regulation of jurisdiction stating that all Congress has done is to "provid[e] a forum so that a new judicial review of the Black Hills claim could take place." But that is the essence of an appellate or trial court decision ordering a new trial. While Congress may *regulate* judicial functions it may not itself *exercise* them. Admittedly, it is not always readily apparent whether a particular action constitutes the assignment or the exercise of a judicial function since

the assignment of some functions is inherently judicial—such as assigning the trial court the task of rehearing a case because of error. The guidelines identified in our opinions, however, indicate that while Congress enjoys broad authority to regulate judicial proceedings in the context of a *class* of cases, *Johannessen* v. *United States,* 225 U. S. 227 (1912), when Congress regulates functions of the judiciary in a *pending* case it walks the line between judicial and legislative authority, and exceeds that line if it sets aside a judgment or orders retrial of a previously adjudicated issue. *United States* v. *Klein, supra,* at 145; *Pope* v. *United States, supra.*

By ordering a *re*hearing in a pending case, Congress does not merely assign a judicial function, it necessarily reviews and sets aside an otherwise final adjudication; actions which this Court concedes Congress cannot permissibly take under the decisions of this Court. *Ante,* at 391–392. The Court concludes that no "review" of the Court of Claims decisions (and our denials of certiorari) has occurred, and that the finality of the judgments has not been disturbed, principally because Congress has not dictated a rule of decision that must govern the ultimate outcome of the adjudication. The fact that Congress did not dictate to the Court of Claims that a particular result be reached does not in any way negate the fact it has sought to exercise judicial power. This Court and other appellate courts often reverse a trial court for error without indicating what the result should be when the claim is heard again.

It is also apparent that Congress must have "reviewed" the merits of the litigation and concluded that for some reason, the Sioux should have a second opportunity to air their claims. The order of a new trial inevitably reflects some measure of dissatisfaction with at least the manner in which the original claim was heard. It certainly seems doubtful that Congress would grant a litigant a new trial if convinced that the litigant had been fairly heard in the first instance. Unless Congress is assuming that there were deficiencies in the prior judicial

proceeding, why would it see fit to appropriate public money to have the claim heard once again? It would seem that Congress did not find the opinions of the Court of Claims fully persuasive. But it is not the province of Congress to judge the persuasiveness of the opinions of federal courts—that is the judiciary's province alone. It is equally apparent that Congress has set aside the judgments of the Court of Claims. Previously those judgments were dispositive of the issues litigated in them; Congress now says that they are not. The action of Congress cannot be justified as the regulation of the jurisdiction of the federal courts because it seeks to provide a forum for the purposes of reviewing a previously final judgment in a pending case.

### B

The action also cannot be characterized and upheld as merely an exercise of a litigant's power to change the effect of a judgment by agreeing to obligations beyond those required by a particular judgment. This Court has clearly never found that the judicial power is encroached upon because Congress seeks to change the law after a question has been adjudicated. See, e. g., *Pennsylvania* v. *Wheeling & Belmont Bridge Co.,* 18 How. 421 (1856); *Hodges* v. *Snyder,* 261 U. S. 600 (1923). This is a recognition of the right of every litigant to pay his adversary more than the court says is required if he so chooses. Congress, acting under its spending powers, is, like an individual, entitled to enlarge its obligations after the court has adjudicated a question. The decision in *Pope* v. *United States,* 323 U. S. 1 (1944), clearly rests upon this distinction.

But here Congress has made no change in the applicable law. It has not provided, as our opinions make clear it could have, that the Sioux should recover for all interest on the value of the Black Hills. Counsel for respondents in fact stated at oral argument that he could not persuade Congress "to go that far." Congress has not changed the rule of law, it simply directed the judiciary to try again. Congress may not attempt

to shift its legislative responsibilities and satisfy its constituents by discarding final judgments and ordering new trials.

## C

The Court also suggests that the congressional action is but a "mere waiver" of a defense within a litigant's prerogative. *Ante,* at 407. Congress certainly is no different from other litigants in this regard, and if the congressional action in this case could convincingly be construed as having an effect no greater than an ordinary litigant's waiver, I certainly would not object that Congress was exercising judicial power. But it is apparent that the congressional action in issue accomplished far more than a litigant's waiver. Congress clearly required the Court of Claims to hear the case in full, and only if a waiver of res judicata by a litigant would always impose an obligation on a federal court to rehear such a claim, could it be said that Congress has exercised the power of a litigant rather than the power of a legislature.

While res judicata is a defense which can be waived, see Fed. Rule Civ. Proc. 8 (c), if a court is on notice that it has previously decided the issue presented, the court may dismiss the action *sua sponte,* even though the defense has not been raised. See *Hedger Transportation Corp.* v. *Ira S. Bushey & Sons,* 186 F. 2d 236 (CA2 1951); *Evarts* v. *Western Metal Finishing Co.,* 253 F. 2d 637, 639, n. 1 (CA9), cert. denied, 358 U. S. 815 (1958); *Scholla* v. *Scholla,* 92 U. S. App. D. C. 9, 201 F. 2d 211 (1953); *Hicks* v. *Holland,* 235 F. 2d 183 (CA6), cert. denied, 352 U. S. 855 (1956). This result is fully consistent with the policies underlying res judicata: it is not based solely on the defendant's interest in avoiding the burdens of twice defending a suit, but is also based on the avoidance of unnecessary judicial waste. *Commissioner* v. *Sunnen,* 333 U. S. 591, 597 (1948); *Blonder-Tongue Laboratories, Inc.* v. *University of Illinois Foundation,* 402 U. S. 313, 328 (1971); *Parklane Hosiery Co.* v. *Shore,* 439 U. S. 322 (1979). The Court of Claims itself has indicated that it would not engage

in reconsideration of an issue previously decided by the Court of Claims without substantial justification:

> "It is well to remember that *res judicata* and its off-spring, collateral estoppel, are not statutory defenses; they are defenses adopted by the courts in furtherance of prompt and efficient administration of the business that comes before them. They are grounded on the theory that one litigant cannot unduly consume the time of the court at the expense of other litigants, and that, once the court has finally decided an issue, a litigant cannot demand that it be decided again." *Warthen* v. *United States,* 157 Ct. Cl. 798, 800 (1962).

It matters not that the defendant has consented to the relitigation of the claim since the judiciary retains an independent interest in preventing the misallocation of judicial resources and second-guessing prior panels of Art. III judges when the issue has been fully and fairly litigated in a prior proceeding. Since the Court of Claims found in this case that there was no adequate reason for denying res judicata effect after the issue was raised and the respondents were given an opportunity to demonstrate why res judicata should not apply, it is clear that the issue has been heard again only because Congress used its legislative authority to mandate a rehearing. The Court of Claims apparently acknowledged that this in fact was the effect of the legislation, for it did not state that readjudication was the product of a waiver, but rather that through its decision the court "carried out the *obligation imposed upon us* in the 1978 jurisdictional statute." (Emphasis added.)

Nor do I find this Court's decision in *Cherokee Nation* v. *United States,* 270 U. S. 476 (1926), dispositive. Again, in *Cherokee Nation,* the Court was asked to consider and decide a question not previously adjudicated by the Court of Claims. The Court stated that the theory of interest presented in the second adjudication was not "presented either to the Court

of Claims or to this Court. It is a new argument not before considered." *Id.,* at 486. Thus even *Cherokee Nation* did not involve congressionally mandated judicial re-examination of a question previously decided by an Art. III court.

Here, in contrast, the issue decided is identical to that decided in 1942. It is quite clear from a comparison of the 1942 decision of the Court of Claims and the opinion of the Court today that the only thing that has changed is an interpretation of the events which occurred in 1877. The Court today concludes that the facts in this case "would not lead one to conclude that the Act effected 'a mere change in the form of investment of Indian tribal property.'" *Ante,* at 413. But that is precisely what the Court of Claims found in 1942. See *supra,* at 425–426. There has not even been a change in the law, for the Court today relies on decisions rendered long before the Court of Claims decision in 1942. It is the view of history, and not the law, which has evolved. See *infra,* at 434–437. The decision is thus clearly nothing more than a second interpretation of the precise factual question decided in 1942. As the dissenting judges in the Court of Claims aptly stated: "The facts have not changed. We have been offered no new evidence." 220 Ct. Cl. 442, 489, 601 F. 2d 1157, 1184.

It is therefore apparent that Congress has accomplished more than a private litigant's attempted waiver, more than legislative control over the general jurisdiction of the federal courts, and more than the establishment of a new rule of law for a previously decided case. What Congress has done is uniquely judicial. It has reviewed a prior decision of an Art. III court, eviscerated the finality of that judgment, and ordered a new trial in a pending case.

## III

Even if I could countenance the Court's decision to reach the merits of this case, I also think it has erred in rejecting the 1942 court's interpretation of the facts. That court

rendered a very persuasive account of the congressional enactment. See *supra,* at 425–426. As the dissenting judges in the Court of Claims opinion under review pointedly stated: "The majority's view that the rations were not consideration for the Black Hills in untenable. What else was the money for?" 220 Ct. Cl., at 487, 601 F. 2d, at 1183.

I think the Court today rejects that conclusion largely on the basis of a view of the settlement of the American West which is not universally shared. There were undoubtedly greed, cupidity, and other less-than-admirable tactics employed by the Government during the Black Hills episode in the settlement of the West, but the Indians did not lack their share of villainy either. It seems to me quite unfair to judge by the light of "revisionist" historians or the mores of another era actions that were taken under pressure of time more than a century ago.

Different historians, not writing for the purpose of having their conclusions or observations inserted in the reports of congressional committees, have taken different positions than those expressed in some of the materials referred to in the Court's opinion. This is not unnatural, since history, no more than law, is not an exact (or for that matter an inexact) science.

But the inferences which the Court itself draws from the letter from General Sheridan to General Sherman reporting on a meeting between the former with President Grant, the Secretary of the Interior, and the Secretary of War, as well as other passages in the Court's opinion, leave a stereotyped and one-sided impression both of the settlement regarding the Black Hills portion of the Great Sioux Reservation and of the gradual expansion of the National Government from the Proclamation Line of King George III in 1763 to the Pacific Ocean.

Ray Billington, a senior research associate at the Huntington Library in San Marino, Cal., since 1963, and a respected student of the settlement of the American West, em-

phasized in his introduction to the book Soldier and Brave (National Park Service, U. S. Dept. of the Interior, 1963) that the confrontations in the West were the product of a long history, not a conniving Presidential administration:

"Three centuries of bitter Indian warfare reached a tragic climax on the plains and mountains of America's Far West. Since the early seventeenth century, when Chief Opechancanough rallied his Powhatan tribesmen against the Virginia intruders on their lands, each advance of the frontier had been met with stubborn resistance. At times this conflict flamed into open warfare: in King Phillips' rebellion against the Massachusetts Puritans, during the French and Indian Wars of the eighteenth century, in Chief Pontiac's assault on his new British overlords in 1763, in Chief Tecumseh's vain efforts to hold back the advancing pioneers of 1812, and in the Black Hawk War. . . .

". . . In three tragic decades, between 1860 and 1890, the Indians suffered the humiliating defeats that forced them to walk the white man's road toward civilization. Few conquered people in the history of mankind have paid so dearly for their defense of a way of life that the march of progress had outmoded.

"This epic struggle left its landmarks behind, as monuments to the brave men, Indian and white, who fought and died that their manner of living might endure." *Id.*, at xiii–xiv.

Another history highlights the cultural differences which made conflict and brutal warfare inevitable:

"The Plains Indians seldom practiced agriculture or other primitive arts, but they were fine physical specimens; and in warfare, once they had learned the use of the rifle, [were] much more formidable than the Eastern tribes who had slowly yielded to the white man. Tribe warred with tribe, and a highly developed sign language

was the only means of intertribal communication. The effective unit was the band or village of a few hundred souls, which might be seen in the course of its wanderings encamped by a watercourse with tipis erected; or pouring over the plain, women and children leading dogs and packhorses with their trailing travois, while gaily dressed braves loped ahead on horseback. They lived only for the day, recognized no rights of property, robbed or killed anyone if they thought they could get away with it, inflicted cruelty without a qualm, and endured torture without flinching." S. Morison, The Oxford History of the American People 539–540 (1965).

That there was tragedy, deception, barbarity, and virtually every other vice known to man in the 300-year history of the expansion of the original 13 Colonies into a Nation which now embraces more than three million square miles and 50 States cannot be denied. But in a court opinion, as a historical and not a legal matter, both settler and Indian are entitled to the benefit of the Biblical adjuration: "Judge not, that ye be not judged."